# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned On Briefs July 18, 2012

## STATE OF TENNESSEE v. DALLAS JAY STEWART

**Appeal from the Circuit Court for Marshall County**
**No. 09-CR-86   Robert G. Crigler, Judge**

---

**No. M2011-01994-CCA-R3-CD - Filed July 22, 2013**

---

The Defendant, Dallas Jay Stewart, was convicted by a Marshall County Circuit Court jury of nine counts of rape of a child, Class A felonies; fourteen counts of aggravated sexual battery, Class B felonies; and one count of exhibition of harmful material to a minor, a Class A misdemeanor. *See* T.C.A. §§ 39-13-522; 39-13-504; 39-17-911 (2010). The trial court sentenced him as a Range I offender to twenty-five-years' confinement for each count of rape of a child, twelve-years' confinement for each count of aggravated sexual battery, and eleven-months, twenty-nine-days' confinement for exhibition of harmful material to a minor. The counts against each victim were ordered to be served consecutively for an effective fifty-year sentence. On appeal, the Defendant contends that (1) the evidence is insufficient to sustain his convictions, (2) the trial court improperly denied his motion to suppress, (3) the trial court erred in failing to merge some of his aggravated sexual battery convictions, and (4) his sentence was excessive. We affirm the judgments of the trial court for exhibition of harmful material (Count 1), five counts of aggravated sexual battery (Counts 10, 13, 23, 24, and 25), and one count of rape of a child (Count 2). We vacate the aggravated sexual battery judgment for Count 26 and dismiss the charge. Because the trial court failed to merge the convictions for eight counts of aggravated sexual battery (Counts 4, 6, 8, 12, 15, 17, 19 and 21) and eight counts of rape of a child (Counts 3, 5, 7, 11, 14, 16, 18, and 20), we vacate the convictions and order the trial court to enter judgments reflecting merger of these aggravated sexual battery convictions into the rape of a child convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court
Affirmed in Part, Vacated in Part, Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Michael Jonothan Collins, Shelbyville, Tennessee, for the appellant, Dallas Jay Stewart.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Robert Carter, District Attorney General; and Weakley E. (Eddie) Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to incidents involving two young girls. At the trial, Lewisburg Police Department Patrol Officer Kevin Clark testified that he met with M.A. and her mother. He said they came to the police station to discuss allegations against the Defendant. He said he took a short statement from M.A., who was upset and crying. He said she did not want to talk, which he said was normal in child sexual abuse cases. He said he informed Detective Scott Braden of the allegations. He said M.A. and her mother were instructed to return another day to talk to Detective Braden.

On cross-examination, Officer Clark testified that although he had training as a detective, he did not take a more detailed statement from M.A. on August 14 because she was very upset and did not want to talk. He said that the interview was not recorded and that after he spoke with M.A., he had her write and sign a statement. He identified the statement M.A. wrote. On redirect examination, he said that M.A. and her mother were at the police station about thirty minutes and that he talked to M.A. for about ten minutes, which included the time M.A. wrote the statement. He said that based on his past experience as a detective, a child or adult victim of sexual abuse did not reveal all of the relevant information in a first interview. On recross-examination, he said he did not do anything to lead M.A. to believe she should not tell him everything.

Lewisburg Police Detective Scott Braden testified that on August 14, 2009, shortly before 6:00 p.m., he received a call from Officer Clark about a sexual abuse allegation. He stated that based upon Officer Clark's information that M.A. was very upset and that another possible victim was not in town, he decided to delay his investigation until the following Monday.

Detective Braden testified that on Monday morning, M.A., A.G., and their mothers appeared at the police station. He said he interviewed M.A. and Detective James Johnson interviewed A.G. and her mother. He said that in interviewing children, it was necessary to build a rapport. He said children rarely disclosed all relevant information during the first interview.

Detective Braden testified that he was with M.A. for about an hour. He said M.A. appeared to be very embarrassed and was more willing to talk when her mother was not in the room. He said he learned that M.A. was eleven years old in July 2009 and that A.G. was nine. He said the Defendant turned twenty-seven in July 2009. He said the victims were interviewed again on August 21, with him interviewing M.A. and Detective Johnson interviewing A.G.

Detective Braden testified that on August 17, 2009, he received information that something was being burned in the Defendant's backyard. He said he and Detective Johnson went to the Defendant's house because he was concerned the items being burned might be relevant to the case. He said the Defendant's mother, Debby Harris, answered the door. He said she told them the Defendant was not home but would return soon. He said he and Detective Johnson went to the backyard and saw a burn pile but said it was old and had cold ashes. He said they left but returned about an hour later, around 2:00 p.m. This time, the Defendant answered the door and let them inside. Detective Braden said he learned from the investigation that the Defendant lived alone, although the Defendant's mother was there. He said he read the Defendant his *Miranda* rights and asked the Defendant to read them. He said the Defendant stated he was studying law enforcement and had completed one and one-half years of technical school. He identified the advice of rights form the Defendant initialed and signed.

Detective Braden testified about the Defendant's statements: The Defendant said the victims spent the night at his house twice. The Defendant stated that he came home on the second occasion and found the victims playing strip poker on his bed and kissing. The Defendant stated that M.A. was nude and A.G. wore only her underwear. The Defendant stated he told the victims to stop and put on their clothes. The Defendant did not state where the victims would have obtained the cards. The Defendant identified the dates the victims stayed at his house as being near the end of July, which would have been July 22 and 29. The Defendant told Detective Braden it did not look good that the victims were naked on his bed and that he never told the victims' parents. Regarding the condoms the victims told Detective Braden about, the Defendant stated the victims might have taken them from his nightstand and played with them. The Defendant did not acknowledge knowing anything about the condoms. The Defendant told Detective Braden that the victims needed to be held accountable for being naked on his bed and that they acted seductively and inappropriately. The Defendant said M.A. had been wearing a "youth bra." When asked if the victims had seen the Defendant naked, the Defendant said A.G. walked in on him in the bathroom once. The Defendant said he bought items at Walmart for the victims recently and that he bought them numerous things previously. The Defendant stated that he met a girl on Craigslist, Jesse, but that they were not intimately involved. The Defendant said his last sexual relationship was a one-night stand fourteen or fifteen months earlier but could not provide

a name or means to contact the woman or the friend at whose house they met. The Defendant stated he had the condoms in order to masturbate. He said the Defendant's mother was outside when they asked the Defendant about his sexual relationships and the condoms.

Detective Braden testified that they searched the house. He identified photographs of the Defendant's bed and nightstand. He said a photograph of a country music singer, Gretchen Wilson, was in a frame on the nightstand. He identified other items in the photographs of the bedroom, including a Bible, a shotgun, and a computer. Regarding the computer, he said he knew of allegations the Defendant and the victims viewed pornography on it. He said he also knew of the victims' claims that a shotgun was in the bedroom. He said it was behind the bedroom door and was not in a case. He said it would be visible when the door was closed. He said an unopened two-pack of condoms was in the drawer of the nightstand.

Detective Braden testified that the time listed on the Defendant's statement was 2:07 p.m. but that the time was written before the statement. He said that another officer brought a camera to the Defendant's house and that the prosecutor came to speak with the Defendant after Detective Braden called the prosecutor. He said the Defendant continued to maintain that he did not touch the victims and that the victims had been playing strip poker and acting seductively.

Detective Braden testified that a written statement was taken after the oral statement. The officers wrote the identifying information but the Defendant wrote the body of it himself. It provided an account consistent with the Defendant's previous oral statement to the officers. The Defendant also stated that when he told the victims to dress, M.A. complied but A.G. "got an attitude" until he threatened to call her mother. He stated that the victims told him not to tell their parents and that he promised he would not if they behaved the rest of the night. He said that he cooked dinner for them, that they fell asleep in front of the television, and that he went to bed. He said that previously, he caught the victims playing with dildos and sex toys. He said that the next day, he bought A.G. an Easy Bake Oven and M.A. a skateboard and that he bought them numerous things previously. He said he bought the oven for A.G. as a birthday gift and the skateboard for M.A. because he did not want her to feel excluded.

Detective Braden testified that the Defendant agreed to come to the police department the next day. He did not arrest the Defendant because the victims were safe, and he had more investigating to do. He said the Defendant appeared voluntarily the next day. He said that although the Defendant was at the police station for several hours, only about one hour and thirty to forty-five minutes of interrogation was involved. He said the Defendant was advised of his rights by Agent Smith, even though the Defendant was not in custody. He said he and

-4-

Agent Smith first talked to the Defendant, then took a recorded statement, and finally took a written statement.

Regarding the verbal statement at the police station, Detective Braden testified that the Defendant did not admit any wrongdoing before Agent Smith mentioned the two types of offenders. He said the Defendant stated he knew that his actions were wrong, that it was a mistake, and that he would have to answer for his actions. He said the Defendant claimed to have acted on impulse and did not want to be this kind of person for the rest of his life. He said the Defendant stated he might need to talk to his mother or a lawyer. Detective Braden said that at this point, he stepped away from the door and the Defendant and that the Defendant continued to talk. He said that the Defendant was not in custody and that Agent Smith told the Defendant that he was free to leave and that anything he said was voluntary. He said the Lewisburg Police Department was separate from the Marshall County Jail, although the police department had locks on the outside of the doors to lock people out, not inside. He said no locked door kept the Defendant from leaving. He said the Defendant stayed and continued to talk, telling them it did not matter because the truth would be revealed eventually because the girls would not hide it long. He said that the Defendant was asked if he understood his rights and that he acknowledged he did. He said the Defendant admitted for the first time that he touched the victims sexually. He said the Defendant admitted he licked the victims' genitalia and touched them with his finger.

Detective Braden testified that at this point, he asked the Defendant to give a recorded statement and that the Defendant agreed. Detective Braden said he reviewed the Defendant's *Miranda* waiver with him. Detective Braden said he told the Defendant to let him know if there was anything the Defendant did not understand. He identified a CD that contained the Defendant's recorded statement.

The Defendant's recorded statement was played for the jury. In it, the Defendant stated: He understood the rights Detective Braden read to him. The second incident occurred the last Wednesday the victims came to his house after church. It was in late July. He said they went to Dollar Tree and bought several toys, including the playing cards the victims used to play strip poker. He stated that he had been outside and that when he went inside, he found the victims unclothed playing strip poker. A.G. asked him, "What's this?"referring to a condom she had taken from the drawer of the bedside table. He told her it was a condom. She asked him to wear it. He said no and that he would get in trouble. He told them they needed to "quit doing this." A.G. continued to insist that she wanted the Defendant to wear the condom. She said that they would say the Defendant put on the condom, whether or not he did. The Defendant decided to "go with the flow" and allowed A.G. to put the condom on him. A.G. began "ejaculating" him as M.A. watched. A.G. had M.A. stimulate him, too. He ejaculated. He removed the condom. A.G. said, "Lick my

-5-

privates." He knew it was a bad idea, but he licked A.G.'s genitalia for a few minutes. He denied touching A.G.'s genitalia with his finger. M.A. asked him to lick her genitalia, and he did for a few minutes. He said he touched M.A.'s clitoris with his index finger but did not insert his finger into her vagina. A.G. placed another condom on him. He rubbed against M.A.'s genitalia, as instructed by A.G. M.A. asked why he did not do the same to A.G., but A.G. said she did not want the Defendant to do it to her because it might hurt. He put his penis "a little bit" inside M.A.'s vaginal lips but did not penetrate her vagina. M.A. was afraid of pain if he penetrated her vagina but she rubbed his penis up and down her genitalia. He did not ejaculate. He did not insert his finger into either victim's anus. A.G. began looking at pornography on his computer, and M.A. dressed and joined her. The incident was the last time the victims stayed with him, not the time before that. There were no other victims. He did not buy things for the victims to ensure their silence. He bought things for them before this incident. He did not tell the truth earlier because he was scared. He later admitted that there was sexual contact on two dates. The first time, he licked the victims' vaginas. The other things, including the condom use, happened the second time. The first incident began when the victims accessed pornographic websites on his computer and asked him questions about sexual activity. The victims told each other that each would let the Defendant lick her genitalia if the other one would, too. A.G. begged and convinced him to lick their vaginas. When A.G. threatened to tell on the second occasion, she was referring to the previous activity. He did not force the victims to do anything. Regarding M.A., he did the same things both times, except the first time he did not rub his penis on her genitalia. He thought the two incidents were two to three weeks apart. He did not tell the truth the previous day because he thought he probably would go to jail, would be listed as a sexual offender for this rest of his life, would lose his job, and probably would lose his house.

After the recording was played, Detective Braden read the written statement he took from the Defendant. It provided: The first incident was on a Wednesday in July after church. The victims used his computer to view pornography. They asked him questions about cunnilingus and sperm. After the victims viewed pornography for about fifteen minutes, A.G. asked him to perform cunnilingus on them. He refused several times, but A.G. begged him until he agreed. He rubbed his finger on M.A.'s vaginal lips and licked her private area. He licked her clitoris for four or five minutes. A.G. "poked" his penis because the victims wanted to see it. Nothing else occurred on that date. The second incident was a couple of weeks later, on a Wednesday after church. He took the victims to Dollar Tree. A.G. selected playing cards, and he thought M.A. bought them. When they reached his house, he did yard work while the victims went inside. When he went inside, he found the victims naked and playing strip poker on his bed. A.G. was playing with condoms and said she wanted to put one on the Defendant. A.G. said she would tell her mother if the Defendant did not wear the condom. The Defendant undressed. He was aroused from seeing the victims naked and "making out." A.G. put the condom on his penis and started to

"ejaculate" him with her hand. A.G. put her mouth and lips on the Defendant's penis and tried to get M.A. to lick his penis, but M.A. refused. He ejaculated, removed the condom, and threw it away. A.G. put another condom on him and told him to rub it on M.A.'s vagina. He rubbed his penis between M.A.'s vaginal lips. M.A. took his penis and rubbed it between her vaginal lips and told A.G. to do the same, but A.G. refused. On both occasions, he touched each victim's clitoris and inside the vaginal lips with his finger.

Detective Braden testified that the prosecutor was present when the statements were taken on August 18 but that the Defendant was unaware of it. He said defense counsel arrived at the end of the interview. Defense counsel was allowed to see the Defendant that day. After defense counsel left, he arrested the Defendant. While they were going across the street to the jail, the Defendant said that God did things for a reason but that he did not understand why he had done what he did.

On cross-examination, Detective Braden testified that he was not notified when defense counsel arrived around 5:48 p.m. but acknowledged that someone else was. He said the Defendant arrived at the police department around 11:00 a.m. He said that once Special Agent Smith arrived, the Defendant was questioned off and on from around noon until the statements were taken. He said the Defendant was allowed to take breaks and go into the lobby and had "ample opportunity" to leave. He said the first part of the interview was not recorded because the Defendant did not want it to be recorded. He did not know who called the police department on August 17 and reported that the Defendant was burning pictures and videotapes.

On redirect examination, Detective Braden testified that Special Agent Smith was present on August 18 to administer a polygraph test, but he arrived late. He said that the process for the Defendant's polygraph examination took "an hour or so" and that he was not in the room. He said that Agent Smith's setting up the equipment, reviewing questions with the Defendant, allowing the Defendant breaks, and reviewing the results took time. He said he began the verbal interview around 4:00 p.m. He said Agent Smith advised the Defendant of the polygraph test results. He said the Defendant declined to have the polygraph examination recorded. On recross-examination, he said he was not in the room during the polygraph examination. He said, though, the questions pertained to the matters on trial.

Lewisburg Police Detective James Johnson testified that on August 17, 2009, he interviewed A.G. and her mother. He said it was not unusual to interview child sexual abuse victims more than once in order to build a rapport and obtain additional information. He said it was unusual for a juvenile female to open up to an adult male in a first interview. He said he did not know A.G. before the interview.

Detective Johnson testified that he and Detective Braden went to the Defendant's house on August 18, 2009. He did not go inside the first time he was there and did not see the Defendant. The second time, they saw the Defendant and went into the house. The Defendant was read his rights. He identified photographs taken inside the Defendant's house. He said the Defendant gave verbal and written statements denying any sexual misconduct. He thought taking the polygraph examination was the Defendant's idea and said the Defendant's mother wanted the Defendant to take the polygraph examination. He said that from the interviews with the victims, he knew that items of evidence for which they should search in the Defendant's house. He said the Defendant consented in writing to searches of the house and the Defendant's computer.

Regarding the search, Detective Johnson testified that condoms were found in the nightstand and that they searched for them in that location based upon the victims' interviews. He said they looked for a handgun and found an unloaded one in the Defendant's truck. He did not recall whether a shotgun recovered from the house was loaded.

On cross-examination, Detective Johnson testified that the handgun was not in the residence, where they expected to find it. He agreed that the Defendant had a permit to carry a handgun and that the handgun was not in the car illegally. He agreed the shotgun was not illegally in the bedroom.

Detective Johnson testified that he took statements from A.G. on August 17 and 21, 2009. He said he wrote the statements and identified them. A.G. wrote her name on the August 17 statement. He acknowledged that the interviews of A.G. were not recorded.

Tennessee Bureau of Investigation (TBI) Special Agent Michael Smith testified that he was a polygraph examiner. He said he gave polygraph examinations to the Defendant on August 18, 2009. He said he arrived at the Lewisburg Police Department around 11:00 a.m. and set up his equipment. He met with the Defendant around noon and began the process. He read the consent form to the Defendant, who signed it. He said the Defendant did not want the polygraph examinations recorded, which Special Agent Smith noted on the consent form. He read the Defendant's *Miranda* rights to him, marked the form appropriately, and had the Defendant read it back to him to ensure the Defendant could read, write, and understand what was happening.

Special Agent Smith testified that the pretest interview lasted about one hour or perhaps a few minutes longer. He said that a person taking the test was informed of all the questions that will be asked and that the person's answers were reviewed. He said there was a separate examination process regarding each of the two victims. Each examination involved nine questions. He said the Defendant took two or three breaks in the process. He

said the pretest interview concluded about 1:30 p.m., followed by a fifteen-minute break. He said the "instrument portion" of the examination was given until about 2:45, when there was another fifteen-minute break. He said the Defendant took a bathroom break and another break to eat food the Defendant's mother brought. He said the post-test interview began around 3:00 p.m. with Detective Braden present. He said he advised the Defendant of the test results. He said that after a few minutes of discussion, the Defendant decided he wanted to give a truthful statement.

On cross-examination, Special Agent Smith testified that the pretest interview included screening to determine if the subject was "testable." He said that occasionally, a person was not testable. He said that his notes from the pretest interview stated that the Defendant had a neurological disorder, Tourett Syndrome, that caused the Defendant to have nervous twitches and shakes. He said that someone with this condition might or might not be a suitable subject for a polygraph examination but that no problems occurred with the Defendant's examination. He said that if the Defendant had strong twitches during the test, it would show on the polygraph charts but that it did not occur.

Special Agent Smith testified that the Defendant stated that he was a situational offender, knew what he did was wrong, acted on impulse, and had Tourett Syndrome. He said the Defendant stated, "I think I might need to talk to my mama and a lawyer." He said that ten or fifteen seconds later, the Defendant said he would be accountable for his actions and was ready to accept responsibility. The Defendant said that he did not want to be this kind of person for the rest of his life and that he did not want to go to jail but that he had to take responsibility. The Defendant stated that he wanted to apologize, that he "can't control it," that he was not gay, and that he had a girlfriend previously. He thought the Defendant was the first person with Tourett Syndrome to whom he had given a polygraph examination.

On redirect examination, Special Agent Smith testified that when the Defendant said the word lawyer, it caught his attention because he thought the Defendant was going to "lawyer up." He said he explained that the Defendant was there voluntarily and was free to leave or to call his mother, lawyer, or anyone else. He said that within a few seconds, the Defendant began making admissions and eventually confessed fully. On recross-examination, he acknowledged that the Defendant's cell phone was turned off for the polygraph examination. He did not recall whether he or the Defendant put it on top of a filing cabinet.

M.A.'s mother testified that M.A. was eleven in July 2009. She said that on August 14, 2009 after 5:00 p.m., she took M.A. to the police department because M.A. said she had been molested. She said she first learned of it in a telephone conversation with A.G.'s mother shortly before 5:00 that afternoon. She said that she questioned M.A. after the

telephone call, that M.A. did not say anything, that she told M.A. she already knew about it because A.G. had revealed it, and that M.A. cried and "started talking." She said M.A. provided details as they waited in the lobby of the police department for about thirty minutes. She said M.A. was upset that night and only said "a little bit" to the police officer. She said M.A. was shaking and crying and had not been that way earlier.

M.A.'s mother testified that she had known A.G.'s mother for about a year. She said her boyfriend was A.G.'s mother's boyfriend's roommate. M.A.'s mother said she was employed as a housekeeper at an apartment complex in Brentwood where A.G.'s mother was the assistant property manager. She said she had been employed for about four months in August 2009. She said A.G.'s mother's boyfriend worked there before she did. She said the Defendant was the painter for the complex. She had known the Defendant for about a year, knew which church he attended, and had visited his home. She said she and the Defendant took turns driving to work together. She said that she had two children who were older than M.A. and two who were younger.

M.A.'s mother testified that her children attended the same church as the Defendant and that the Defendant knew them. She said she and M.A. visited socially inside the Defendant's home at least twenty to thirty times. She said her relationship with the Defendant was platonic. She said that almost a year before July 2009, the Defendant went with her children, her boyfriend, and her on a shared-expense vacation to Gatlinburg. She said they took a second vacation together to Myrtle Beach in the period between the alleged offenses on July 22 and 29, 2009, and August 14, when she took A.G. to the police station. She said that M.A. rode in the car with the Defendant and the Defendant's brother and that everyone stayed in one hotel suite.

M.A.'s mother testified that she made arrangements to return to the police station on August 17, 2009. She asked her boyfriend to come, and she notified A.G.'s mother that the police wanted A.G.'s mother and A.G. to attend. She said M.A. and A.G. were not together to discuss the case between July 29 and August 17.

When asked why she allowed her eleven-year-old daughter to stay overnight with the Defendant, who lived alone, she said, "We were friends. He spent the night at our house. He had been to all of our children's birthday parties, and we were friends." She said she trusted the Defendant and thought he would take care of M.A. She said M.A. led her to believe A.G.'s mother had already given A.G. permission to stay overnight with the Defendant if M.A. stayed also. She said that she had since spoken with A.G.'s mother and learned they were deceived.

M.A.'s mother testified that on July 22, 2009, M.A. called her from church using the Defendant's cell phone and asked to spend the night with him. She told the victim to come home to do her chores first, that the Defendant brought the victim home to do the chores, and that the Defendant and the victim left soon thereafter. She said she called to make sure M.A. was okay and spoke with the Defendant. She thought she saw the Defendant around 6:00 a.m. the next morning, when he drove them to work. She said A.G. went to work with them.

M.A.'s mother testified that M.A. did not say anything about the July 22 incident before July 29. She said that on July 29, M.A. called from church and asked if she could spend the night with the Defendant. She was led to believe A.G. already had permission to stay overnight with the Defendant. She thought the Defendant told her that A.G.'s mother and A.G.'s mother's boyfriend would be there. She told M.A. to come home to do her chores first. She said that the Defendant brought M.A. home, that A.G. was with them, and that they left a short time later. She said that the next day, the Defendant called and said he was sick and she drove herself to work. She said the Defendant told her he was going to take M.A. and A.G. to Walmart. She said she later saw M.A. with a skateboard that she had not purchased.

On cross-examination, M.A.'s mother testified that she did not have any suspicions before August 2009. She said that between July 22 and 29, M.A. was really quiet, which was different from her ususal outgoing personality. She said M.A. denied that something was wrong. She said, though, that M.A. was not emotional and did not act out. She said M.A. usually was friendly to the Defendant but was not during this time period, although M.A. did not act afraid of the Defendant. She said M.A. never indicated she did not want to be around the Defendant before August 14. She said that when they traveled to Myrtle Beach after the two incidents, M.A. rode in the Defendant's truck for some period of time at the request of the Defendant's younger brother and never indicated a desire during stops to ride in the other car.

M.A.'s mother testified that when M.A. called on July 29, M.A. sounded like she did not really want to stay at the Defendant's house. She said M.A.'s reluctance was the reason she had M.A. come home first. She said that when M.A. came home, M.A. did not do anything to indicate she did not want to go. She said she asked M.A. if she thanked the Defendant for the skateboard. She said she asked the Defendant why he bought it and "he said he just did." She said the Defendant bought other gifts for M.A. during the time they had known him. She said that although M.A. had been alone with the Defendant on occasions such as going to a grocery store, July 22 and 29 were the only overnight stays. She estimated she entrusted the Defendant with M.A.'s care five or six times in the year before July 2009. On redirect examination, M.A.'s mother said the five or six times were short periods of ten to fifteen minutes.

Thirteen-year-old M.A. testified that she was eleven in July 2009. She said that on July 22, she went to church with the leader of a youth group. She said the Defendant was present and played guitar with her brother. She said A.G. approached her and asked if she wanted to spend the night at the Defendant's house. She said the Defendant told her she had to ask her mother. She had never spent the night at the Defendant's house. Using the Defendant's cell phone, she called her mother, who told her she must come home to do her chores before going to the Defendant's house. She said the Defendant took her home, where she got some clothes and did her chores. She said that after they left her house, the Defendant took A.G. and her to Dollar Tree, where he bought a small skateboard for her, a puzzle for A.G., and a deck of playing cards.

M.A. testified that they went to the Defendant's house and opened their toys. She said the Defendant went to his bedroom, called them into the room, and closed the door. She said he told them he wanted to show them a game called strip poker. She said she did not know about the game previously. She said the Defendant told them they must remove an article of clothing every time they lost. She said she and A.G. lost and were nude and that the Defendant still wore his shirt but not his pants or underwear. She said she was mad, threw the cards on the floor, and went into the living room.

M.A. testified that the Defendant called them back into the bedroom, said he was going to show them something on the computer, and told them to undress. She said that they told him they did not want to undress but that he told them to do it anyway. She said she left the room and did not look at the computer. She said she prepared chicken nuggets, which she burned but A.G. ate.

M.A. testified that the Defendant called them into the bedroom a third time. She said he told them to undress, they told him they did not want to, and he told them to do it anyway. She said the door was closed and she saw a long gun behind the door and a handgun on the nightstand. She said the Defendant did not threaten her with a gun. She said that after they were nude, the Defendant told them to get on the bed. She said the Defendant licked her "pee pee." She said he also "put his thing in mine." She said he told them what a condom was, that she had not known, and that he took one from his dresser drawer and wore it. She said that when the Defendant penetrated her with his penis, he put her legs on his shoulders while she lay on the bed. She said he penetrated her but did not insert all of his penis into her vagina. She said she knew he penetrated her because she felt it. She said he touched her on her "butt." She said he penetrated her vagina with his finger. She said that afterwards, she dressed and ran into the living room, where she slept on the couch. She said A.G. was in the room during the incident but did not recall if the Defendant did anything to A.G. She said that when they left, the Defendant told them not to tell their mothers. She said she did not tell anyone because she was scared.

M.A. testified that on July 29, 2009, she went to church with the youth group leader. She said the Defendant and A.G. were present. She said that after church, A.G. asked her if she wanted to go to the Defendant's house again. She said that the Defendant told her she must call her mother and that when she did so, her mother said she must come home first. She said the Defendant took her home, where she completed a chore and got clothes, and then went to his house. She said that they ate and that the Defendant called them into his bedroom and closed the door. She saw the guns behind the door and on the nightstand. The Defendant told them to undress, but she did not want to undress. She said that after they undressed, he told them to get on the bed. She said the Defendant licked her "pee pee" and that she felt his tongue penetrate her vagina. She said he penetrated her vagina with his fingers. She said he also touched her chest and her "butt" with his hand. She said he kissed her chest. She said the Defendant did not penetrate her with his penis. She did not recall if he wore a condom but said he masturbated until he ejaculated onto her foot. She said that she dressed and that she and A.G. went into the "music room" and locked the door. She said that the Defendant did not bother them again that night and that when he took them home the next day, he told them not to tell their mothers. She said that before he took them home, they went to Walmart, where the Defendant bought her a skateboard and A.G. an Easy Bake Oven. She said she did not tell her mother that morning because her mother had to leave for work.

M.A. testified that she did not say anything until her mother questioned her after A.G. revealed the sexual contact. She said her mother took her to the police station, where she talked to two officers. She identified photographs of the Defendant's bedroom that depicted the guns, bed, computer, and nightstand.

On cross-examination, M.A. testified that she had been to the Defendant's house several times and had seen the guns before July 22, 2009. She said he never picked up or pointed the guns at A.G. or her on July 22 or 29. She acknowledged her written statement from the first police interview did not include the details of her testimony. She said she was scared at the first police interview but did not know of whom she was scared. She agreed she would not call her mother and ask to return to the house of someone who scared her. She said she rode to Myrtle Beach with the Defendant at the Defendant's brother's request. She disagreed that she would not want to take a long car ride with someone who scared her. Regarding her second police interview, she acknowledged saying that before the first incident, she and A.G. played on the Defendant's computer in his bedroom while he folded clothes. She said her testimony that she did not look at the computer that day was accurate and that she told the police they were on the computer because A.G. used it.

When asked about her statement that the Defendant next put her legs on his shoulders and tried to penetrate her vagina with his penis, M.A. testified that her testimony that he put

-13-

his fingers in her vagina was accurate. She said she was not having a hard time remembering. She said that when he touched her "butt," he did not penetrate her anus. She agreed she did not see the Defendant do anything to A.G. on July 22 and did not know why she told the police otherwise. She said that when she talked to the police, she thought she was in trouble. She did not know if she wanted to make her mother and the police happy with what she told them. She could not give another reason why she would have signed the statements. She did not know why she did not tell the police about the Defendant's kissing her chest. She said she was not rushed to read the statement before she signed it and said there was not a reason she did not tell Detective Braden or her mother about the parts that were not true. She agreed she did not see what happened between A.G. and the Defendant on July 29 and did not know if she told the police she did.

On redirect examination, M.A. testified that she was crying, upset, and scared the first time she talked to the police. She said she was at the police department for a short time. She agreed she told the police the Defendant kissed her "all over" and kissed her "pee pee." She agreed that she wrote the first statement, which was three lines, and that an officer wrote the second one, which was longer. She said her testimony was true and agreed that some of the facts about which she testified were not in the statement. She said she did not see or talk to A.G. between giving the first statement on August 14, 2009, and the second on August 17, 2009. She said they were not interviewed together on August 17. She said A.G. was next to her on the bed during both incidents. On recross-examination, M.A. acknowledged that no one told her she could not have as much time as she wanted or that she could only write three lines on August 14.

A.G.'s mother testified that she was employed in July 2009 as the assistant manager of the apartment complex where she and A.G. lived in Brentwood. A.G. was nine years old at the time. She said that she had known M.A.'s mother for about six months. She said M.A.'s mother had been the housekeeper at the apartment complex for about two months. A.G.'s mother said her boyfriend, Richie, worked at the apartment complex performing maintenance. She said she had known the Defendant for about six months and that he had been employed as a painter at the complex for three or four months. She said that until about a month before that July, Richie and the Defendant were roommates. She said she and A.G. had been to the Defendant's house several times, but she did not recall A.G.'s going anywhere with the Defendant before July 22.

A.G.'s mother testified that on July 22 and 29, 2009, A.G. asked if she could go to church in Lewisburg with the Defendant and M.A. She said she gave her permission. She talked to the Defendant, who said he was going to take M.A.'s mother home from work and take the girls to church. She said she did not talk to M.A.'s mother before M.A.'s mother left Brentwood that day. She said A.G. did not have school the next day and that A.G. came

home when the Defendant reported for work around 7:30 a.m. She said A.G. did not mention anything about the incident after coming home that day.

A.G.'s mother testified that on July 29, 2009, the Defendant asked if A.G. could go to church with M.A. and him. She said A.G. stated she wanted to go. She said that although she told the Defendant she wanted to speak with M.A.'s mother first, she was unable to do so before M.A.'s mother left the complex. She said she wanted to talk to M.A.'s mother "to make sure it was okay that [A.G.] spent the night there again." She said that on July 29, the Defendant led her to believe A.G. would spend the night at M.A.'s house. She said she went outside and saw the Defendant, M.A.'s mother, and A.G. leaving in the Defendant's truck. She said she next saw A.G. the following morning. She learned sometime later that A.G. actually spent the night at the Defendant's house and thought the date was August 13. She said she talked to M.A.'s mother a few days after learning of this. She said that to her knowledge, A.G. and M.A. did not see or talk to each other between July 29 and the day the matter was reported to the police.

On cross-examination, A.G.'s mother denied that the incidents involving the Defendant came to light after A.G. was caught "abusing" another child. She denied telling a hospital employee otherwise and said that if a medical report stated this, it was wrong. She said she may have told hospital staff the dates of the incidents involving the Defendant were July 29 and August 12. She said that when A.G. first told her about the sexual contact, A.G. said something happened with the Defendant on August 12.

When asked why she did not call M.A.'s mother on July 29 after she saw A.G., M.A.'s mother, and the Defendant drive away, A.G.'s mother said she "guessed" it was not that important to her to speak with M.A.'s mother. She said she assumed it was okay for A.G. to spend the night with M.A. when she saw them drive away. She said that when she asked A.G. about going to Lewisburg on July 29, she asked if A.G. wanted to go to church and spend the night with M.A. but did not know M.A. would spend the night at the Defendant's house. She said she did not learn where the victims spent the night for a few days. She said that after July 29, A.G. was around the Defendant and did not appear afraid of him or as if she were trying to avoid him. She did not recall what she told the hospital staff but said it would have been as a result of what A.G. told her.

On redirect examination, A.G.'s mother testified that A.G. was afraid that telling A.G.'s mother about the incidents would make A.G.'s mother mad. She did not recall if she fussed at A.G. She said the incidents were discovered after she received a report about another child having inserted a toy into a neighbor child's private area. She denied telling Our Kids Clinic personnel that A.G. inserted a toy into a child's private area and said she told them another child did it. She said A.G. was never caught doing this and that Our Kids

-15-

Clinic's records were mistaken. She agreed that A.G. had trouble talking to the police in her presence on August 17 and that she had to leave the room.

A.G.'s mother testified that the Defendant stayed overnight at her apartment on August 12, 2009, and that A.G. made an allegation about that night when she reported it to Williamson County authorities. As far as she knew, the case was under investigation. On recross-examination, she said the Defendant had not been arrested or charged in Williamson County and agreed it had been over one and one-half years since that incident.

A.G. testified that she was nine in July 2009. She said that on July 22, 2009, she went to church with M.A. and the Defendant. She said that after church, they went to Dollar Tree, where the Defendant bought some skateboards for M.A., a puzzle for her, and playing cards for himself. She said that at the Defendant's request, she asked M.A. to spend the night with her at the Defendant's house.

A.G. testified that when they arrived at the Defendant's home, she and M.A. played with their new toys. The Defendant brought his musical instruments inside and called A.G. and M.A. into his bedroom. She said that he taught them to play strip poker and that she had not been familiar with the game. She said that she lost the game and wore only her panties, that M.A. wore her panties and bra, and that the Defendant wore a shirt with no clothing below his waist. She said M.A. was angry and threw the cards on the floor. She said she and M.A. went into the Defendant's bathroom, dressed, and left the bedroom. She said the Defendant called them back into the bedroom and told them to undress. She said the Defendant showed them three videos on his computer: two depicting a boy and a girl having "ordinary sex" and one depicting two girls "using sex toys." She said she knew what the "sex toys" were because the Defendant told her. She said she had never seen anything of that nature. She said M.A. was in the room but was not paying attention.

A.G. testified that the Defendant called them into his room. She said that he told them to undress, that they said they did not want to, and that he told them to do it anyway. She said that he told them to lie on the bed, that they complied, and that he began touching her "pee pee" with his hand. She said he penetrated her "a little." She said he also touched and penetrated her "pee pee" with his tongue. She said the Defendant was nude. She said that she had not known about condoms but that the Defendant explained them and put one on his "weenie." She said that the Defendant told her to suck his private part and that she complied by putting his penis in her mouth. She said the Defendant had a shotgun behind the bedroom door and another gun on his night stand but that he did not handle them in her presence or threaten her with them. She said the Defendant touched and licked M.A.'s private part in her presence and that he tried to penetrate M.A.'s private part with his penis. She did not recall if the Defendant touched M.A. anywhere else. She said M.A. made chicken nuggets for them

-16-

after the incident, that they were burned, and that she ate some of them anyway. She said that they went to bed in "Richie's old room" and that the Defendant kept bothering them until they locked the door to keep him out. She said the Defendant took them home the next day. She said he told them not to tell anyone, especially their parents, about the incident.

A.G. testified that on July 29, 2009, the Defendant took her to church. M.A. was at church also. She said that she was supposed to spend the night at M.A.'s house but that the Defendant asked M.A.'s mother if they could spend the night at his house. She said that they went to the Defendant's house, that he called them into the bedroom, and that he told them to undress and get on the bed. She said they complied. She said the Defendant touched her private part with his hand and licked it. She said he penetrated her vagina with his finger and tongue. She said that he told her to suck his penis and that she complied. She said that the Defendant showed her on July 22 how to put a condom on his penis and that she put a condom on him on July 29. She said the Defendant made her rub his penis with her hand. She said the Defendant masturbated himself and ejaculated on M.A.'s chest. She said she and M.A. dressed and watched television in the living room. She said the Defendant did not speak to them for the rest of the evening. She said that the next morning, the Defendant took them to Walmart and bought M.A. a skateboard and her an Easy Bake Oven and a Brat doll. She said the Defendant took them home and told them not to tell their parents. She said that she eventually told her mother and that she was scared and embarrassed.

On cross-examination, A.G. testified that the first person she told about the incidents was her mother and that she told her mother shortly after her birthday on August 12. She said she was interviewed by Charlsi Legendre the next day. She agreed she told Ms. Legendre that she used to spend the night at the Defendant's house with Richie's children and that the Defendant touched her while she was sleeping at her house. She agreed she told Ms. Legendre nothing happened at the Defendant's house. She said she lied to Ms. Legendre about the Defendant touching her in her sleep because she was embarrassed. She said the Defendant's actions hurt her feelings. She said she did not say no when the Defendant asked her to go to church and to his house on July 29 because she thought he could hurt her with his guns. She said she first saw the guns on July 22. She said he never touched or talked about the guns. She said he did not make any threats about what he would do if she told her mother about the incidents. She acknowledged that the Defendant did not touch her breasts.

A.G. testified that although she signed statements to the police, she did not read them first. She said she did not write any statements herself. She said she was examined at a hospital by a nurse but did not remember if she told the nurse the truth. She denied telling a detective that the first incident occurred in the Defendant's living room. She said she did not know what the "white stuff" was that came from the Defendant's penis until the

Defendant told her it was sperm. She said she told Detective Johnson about the Defendant's telling her on July 29 to put her mouth on his penis.

Martha Lampley testified for the Defendant that she was a records custodian for Nashville General Hospital. She identified hospital records for M.A. and A.G., which were received as exhibits. On cross-examination, Ms. Lampley said the hospital was the record keeper for Our Kids Clinic but agreed the clinic was at a different location. The records reflect that upon examination of the victims, the occurrence of sexual contact could neither be confirmed nor eliminated.

Detective James Johnson was recalled and testified that when he interviewed A.G. on August 17, 2009, he wrote a statement regarding her allegations. When asked about the statement, which was received as an exhibit, he said A.G. told him that the second incident occurred two weeks after the first and that the second was on the last Wednesday in August. He stated that A.G. said the Defendant told M.A. and her to go into the living room, that she sat on the couch, that M.A. sat on the chair, and that he told her to take off her clothes in the living room.

Detective Johnson testified that when he interviewed A.G. on August 21, 2009, he wrote a statement about her allegations. He said the statement did not include a claim that the Defendant placed his penis in or near A.G.'s mouth. He said he asked A.G. to read and sign the statements to verify their accuracy. He said she appeared to read them and signed them.

On cross-examination, Detective Johnson acknowledged that he did not know whether A.G. read the statements. He agreed that the statement said the date of the second incident was August 29, 2009, but that the statement was created before that date, on August 17, 2009. He agreed the statement was mistaken and that the date of the second incident should have been identified as July 29, 2009. He said the statement taken on August 21, 2009, did not contain any allegations about an incident on July 22, 2009.

The jury convicted the Defendant of nine counts of rape of a child, fourteen counts of aggravated sexual battery, and one count of exhibition of harmful material to a minor. After the court imposed the effective fifty-year sentence, this appeal followed.

**I**

The Defendant contends that the evidence is insufficient to sustain his convictions. The State counters that the evidence is sufficient. We conclude that the evidence is

insufficient to support the aggravated sexual battery conviction for Count 26 but that the evidence is sufficient to support the other convictions.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State.  *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury.  *See State v. Bland*, 958 S .W.2d 651, 659 (Tenn. 1997).

Count 1 charged the Defendant with exhibiting harmful material to A.G. on an unspecified day in July 2009.  "Harmful material" includes an image of the human body depicting nudity or sexual conduct.  T.C.A. § 39-17-911(a)(1) (2010).

Pertinent to this appeal, "[r]ape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age."  T.C.A. § 39-13-522(a) (2010) (amended 2011).  "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required."  *Id.* § 39-13-501(7) (2010).

The Defendant was convicted of nine counts of rape of a child:

Count 2:      Fellatio involving A.G. on July 22, 2009;
Count 3:      Cunnilingus involving A.G. on July 22, 2009;
Count 5:      Cunnilingus involving M.A. on July 22, 2009;
Count 7:      Digital penetration of M.A. on July 22, 2009;
Count 11:     Penile penetration of M.A. on July 22, 2009;
Count 14:     Digital penetration of A.G. on July 29, 2009;
Count 16:     Cunnilingus involving A.G. on July 29, 2009;
Count 18:     Cunnilingus involving M.A. on July 29, 2009;
Count 20:     Digital penetration of M.A. on July 29, 2009.

Pertinent to this case, "[a]ggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4) (2010).  "'Sexual contact' includes the intentional touching of the

victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" *Id.* § 30-13-501(6).

The Defendant was convicted of fourteen counts of aggravated sexual battery:

Count 4:      Touching A.G.'s genital area with his mouth and/or tongue on July 22, 2009

Count 6:      Touching M.A.'s genital area with his mouth and/or tongue on July 22, 2009;

Count 8:      Touching M.A.'s genital area with his hand and/or finger on July 22, 2009;

Count 10:    Touching M.A.'s buttocks with his hand and/or finger on July 22, 2009;

Count 12:    Touching M.A.'s genital area with his penis on July 22, 2009;

Count 13:    A.G.'s touching the Defendant's penis with her hand on July 29, 2009;

Count 15:    Touching A.G.'s genital area with his hand and/or finger on July 29, 2009;

Count 17:    Touching A.G.'s genital area with his mouth and/or tongue on July 29, 2009;

Count 19:    Touching M.A.'s genital area with his mouth and/or tongue on July 29, 2009;

Count 21:    Touching M.A.'s genital area with his hand and/or finger on July 29, 2009;

Count 23:    Touching M.A.'s buttocks with his hand and/or finger on July 29, 2009;

Count 24:    Touching M.A.'s breast with his mouth on July 29, 2009;

Count 25:    Touching M.A.'s breast with his hand and/or finger on July 29, 2009;

Count 26:    Touching M.A.'s buttocks with his mouth and/or tongue on July 29, 2009.

The Defendant argues that the evidence is insufficient because the only admissible proof was the victims' testimony. He argues that his statements cannot be considered because they were obtained illegally, which we reject in Section II of this opinion. He notes the absence of conclusive medical proof of sexual assault and the lack of DNA evidence. He also argues that it is unlikely the victims would have gone back to the Defendant's house on July 29 if sexual assaults occurred on July 22. He does not argue that the State failed to offer any proof regarding specific counts of the indictment.

We have considered each count and its respective evidence. Viewed in the light most favorable to the State, the evidence is sufficient to support all the convictions except Count 26. Regarding Count 26, M.A. said in a written statement that on July 29, the Defendant

kissed her "all over." She testified, however, that the Defendant did not touch her with his tongue anywhere except her private part on July 29. She also testified that the only place he kissed her on that date was her breast area. The evidence is insufficient to support the conviction for Count 26, and the judgment for that count is vacated and the charge is dismissed. Otherwise, the Defendant is not entitled to relief on the basis of insufficient evidence.

## II

The Defendant contends that the trial court improperly denied his motion to suppress his pretrial statements. The State contends that the trial court properly denied the motion because the Defendant did not make an unequivocal request for an attorney. We conclude that the trial court did not err in denying the motion to suppress.

The trial court conducted a lengthy hearing on the Defendant's motion to suppress, at which Lewisburg Police Detective Scott Braden testified that he participated in the investigation of the Defendant in the summer of 2009. He said that he interviewed the Defendant at the Defendant's house on August 17, 2009, and that Detective Johnson was with him. He said a third officer and Assistant District Attorney General Eddie Barnard arrived at the house later. He said that he was at the Defendant's house for approximately three and one-half to four hours, that about one and one-half hour of that time was spent interviewing the Defendant, and that they conducted a search of the Defendant's residence for the remainder of the time. He said that during the interview, the Defendant and his mother made multiple requests for the Defendant to take a polygraph and that a polygraph was scheduled for 10:30 or 11:00 the next morning, August 18, at the police station. He said that neither the Defendant nor his mother asked how long the Defendant would be at the police station for the polygraph and that they did not discuss whether the Defendant should come to the police station alone. He said that the Defendant arrived at the police station on August 18 between 10:30 and 11:00 a.m.

Detective Braden testified that the police station was located beside the city courtroom and that the building was divided into public and secured areas. He said that the lobby and the clerks' area were public areas and that a code must be entered or someone must "buzz" a visitor to enter the secured areas. He clarified that the doors were only secured for entry to the offices and interview room and that they were not locked from the inside. He said that behind the public area, there were detectives' offices, a garage, a locker room for patrol officers, an evidence locker, and an interview room. He said that the interview room was down the hallway from one of the doors into the secured area and that the room had a one-way window. He said that interview room had one door and that the interview room door did not have a lock but was closed during the Defendant's interview. He said that there

was no video recording of the Defendant's interview through the one-way window and that the police department's video camera was used to record crime scenes. He said the room on the other side of the window was Detective Johnson's and Detective McClain's office. He said no recording devices were in the interview room. He said that the police department had audio recorders, that one was in his office on the day of the Defendant's interview, and that a digital audio recorder was used near the end of the interview. He said that the lobby had a table, a chair, and a telephone to contact people in the back.

Detective Braden testified that he was at the police station on August 18, 2009, and that he went to the lobby around 10:45 a.m. and saw the Defendant. Detective Braden said he was dressed in "plain clothes" and had his badge and his firearm. He said he spoke to the Defendant for two to three minutes, advised him where the restroom, water, and waiting area were, told the Defendant that he would return shortly, and informed him they were setting up and waiting for Agent Smith to arrive. He said that when he spoke to the Defendant, he thought Agent Smith would arrive around 11:00 a.m. but that around 11:00, he learned that Agent Smith would not arrive until around noon. He thought that another detective told the Defendant about the delay and that the Defendant never asked about rescheduling.

Detective Braden testified that TBI Special Agent Mike Smith, a polygraph examiner, arrived around noon and that the Defendant was taken to the interview room after Agent Smith set up the polygraph equipment. He said that he took the Defendant through the second secured door, not the door down the hall from the interview room, because the Defendant was closer to the second door. He said that he searched the Defendant before taking him into the secured area and that the Defendant could have observed him enter the code into the door's keypad. He said that he thought the Defendant turned off his cell phone and put it into his pocket. He said that if the Defendant had gone into the interview room with the phone, it would have been taken when the Defendant was taken into custody between 5:30 and 6:00 p.m.

Detective Braden testified that he was in the room with Agent Smith and the Defendant during the completion of the rights waiver and the polygraph consent forms but that after the forms were complete, Agent Smith and the Defendant were alone in the room. He said the Defendant indicated on the form that he did not want the polygraph recorded. He said he did not know how documentation was produced from the polygraph because Agent Smith did it. He said that there was no recording equipment set up when Agent Smith reviewed the consent form for the polygraph with the Defendant. He said that there was no discussion about recording the polygraph, that the Defendant was not told how long it would take to set up the recording equipment, and that the Defendant indicated "no" on the form when asked if he wanted the examination recorded. He said that the form was signed at 12:11 p.m. but that he was unsure how much later the examination began because he left the

interview room after the forms were completed and did not return until 3:15 or 3:30 p.m. He said that he did not return to the room until the post-test interview but that he observed the examination through the one-way window, though he could not hear well because the speakers were not working. He said the Defendant left the room two or three times for breaks, walking alone to the lobby more than once. He said no one accompanied the Defendant to the restroom in the lobby.

Detective Braden testified that when he returned to the interview room, Agent Smith reviewed the polygraph results with the Defendant. He stated that Agent Smith told the Defendant that the polygraph indicated deception and that Agent Smith explained the difference between situational and preferential sexual offenders. The Defendant said he was a situational offender. The Defendant said that he knew what he did was wrong, that he made a mistake, that he would have to answer for the things he did, and that he acted on impulse. Detective Braden said that after these statements, the Defendant said that he "might need to speak to his mom or a lawyer." Detective Braden said that there was a pause in the conversation after the Defendant's statement but that the Defendant resumed talking.

Detective Braden testified that Agent Smith told the Defendant that he was free to leave and that anything the Defendant said was voluntary. He said the Defendant responded that it did not matter because the truth would come out and that the girls would not "hide it long." Detective Braden stated that Agent Smith asked the Defendant if he still understood his rights and that the Defendant said he did. Detective Braden said that he reviewed the rights waiver with the Defendant again at 4:47 p.m., that the Defendant signed the waiver, and that the Defendant never requested an attorney. He denied that anyone asked the Defendant if he waived his rights. He said that the Defendant continued talking and that he stopped him and asked if he could record the interview to obtain an accurate account. He said that the Defendant agreed and that he reviewed the Defendant's rights with him again. He said that other than the Defendant's comment that he might need to speak to his mother and a lawyer, the Defendant made no other references to a lawyer the remainder of the day.

Detective Braden testified that he did not remember discussing if the Defendant had a mental disorder but that he remembered the Defendant had "tics or jerks" during the time he was with him on August 17 and 18. He said that he thought the disorder was Tourett Syndrome but that he did not remember if the Defendant told him that. He stated that when he reviewed the rights waiver form with the Defendant, the Defendant said that he was not taking any medications and was not under a doctor's care. He said that he asked the Defendant if he had any "mental or emotional problems" and that the Defendant responded that he did not. He said that he noticed the Defendant's "nervous tics."

Detective Braden testified that he reviewed the *Miranda* waiver with the Defendant, read it to him, asked him to review it himself, and asked if there was anything that needed to be clarified. He said that the Defendant acknowledged that he understood everything, reviewed the waiver himself, and initialed it. He said this process took about ten or fifteen minutes. He said that the Defendant gave a statement that was recorded but that he could not write as quickly as the Defendant spoke. Detective Braden said that after the audio statement was recorded, he had the Defendant repeat the information and that he prepared the written statement and had the Defendant review and initial it. He said he and the Defendant were reviewing the statement when he learned defense counsel was at the police station. He thought ten to fifteen minutes elapsed between the time he learned defense counsel was at the police station and the time defense counsel was allowed to see the Defendant. He said the Defendant was not in custody until after he confessed and explained that the Defendant's confession was a combination of the recorded and written statements. He stated that the Defendant was free to leave after he told officers he was a situational sexual offender but that he was not free to leave after he gave the recorded statement. He said that he did not tell the Defendant an attorney was there to see him because he did not want to "break the concentration." He thought the Defendant ate lunch during the post-interview.

On cross-examination by the State, Detective Braden testified that nothing physically prevented a person leaving the police station through the back door by the hallways in the secured area and that a code or key was not needed to exit. He said that doors to the lobby were not locked when Agent Smith told the Defendant he could leave. He said the Defendant went to the restroom in the front lobby during the breaks in his interview. He said the Defendant knew he did not need a key to go through the door from the secured area into the lobby because he had done so during his breaks. Detective Braden said that the interview room was "pretty big" and measured approximately twelve to fifteen feet by fifteen to twenty feet. He said that on the day of the Defendant's interview, there were chairs, a table, a filing cabinet, and a stand with a phone and fax machine. He said there was a four- to six-person table in the interview room.

Detective Braden testified that he was assigned to the case on August 14, 2009, the day the police department received information about it. He said he did not contact the Defendant until August 17, 2009. He said he and Detective James Johnson went to the Defendant's house on August 17 around 1:00 p.m. to speak with the Defendant because they received information that the Defendant was burning photographs and videos in his yard. He said that the Defendant's mother, Debbie Harris, met the officers outside and that he asked her to allow them to see the burning. He stated that Ms. Harris told them the Defendant was in Franklin and that no one had burned anything. He said he could see a burn pile that was not fresh from where they stood. He stated that Ms. Harris did not tell them that the Franklin Police Department was taking a voice stress analysis of the Defendant on

allegations of child sex abuse and that he learned of the voice stress test after the Defendant returned home. He told Ms. Harris he wanted to speak with the Defendant. He said Ms. Harris stated that the Defendant would return soon and that she would tell him. He said that he and Detective Johnson left after speaking with Ms. Harris, that they saw the Defendant's truck returning to his house as they left, that they met with the district attorney and the police chief, and that they decided to return to the Defendant's house to interview him. He said that they returned to the Defendant's house at 2:00 p.m. and that the Defendant was there. He said that he asked the Defendant if they could enter the house and that the Defendant allowed them into the house.

Detective Braden testified that he told the Defendant he was there to speak with him about allegations that he sexually assaulted the two victims. He stated that the Defendant said he had been accused of other similar acts, that he had just returned from the Franklin Police Department where he took and passed a voice stress analysis, and that he was cleared there. Detective Braden said that the Defendant agreed to speak with them, that he advised the Defendant of his *Miranda* rights, and that the Defendant reviewed and signed the *Miranda* waiver. He said the Defendant denied taking medication, drinking any alcoholic beverages, taking any illegal drugs, being epileptic or diabetic, or having any mental or emotional problems. He said that the Defendant was not in custody when he completed the waiver but that obtaining the waiver was standard procedure when interviewing a suspect. He said nothing indicated the Defendant did not understand his rights.

Detective Braden testified that after the Defendant signed the *Miranda* waiver, he interviewed the Defendant for one and one-half hours. He said the Defendant told him the victims spent the night at his house a few times in the last month. The Defendant said that on the Wednesday before the interview, he went into the house and found the victims playing strip poker on the bed. He said that one victim, M.A., was naked and the other victim, A.G., was wearing underwear and that they were kissing each other. He said that it did not look good to have the girls in his house and naked on his bed and that he did not tell their parents. Detective Braden asked if there were condoms in the house and how the victims knew where the condoms were. The Defendant told him that the victims may have found them in his night stand and played with them. The Defendant said that the victims were acting in a seductive, inappropriate manner and that they should be held accountable for their actions. Detective Braden said the victims were ten and eleven years old at the time of the crimes. Detective Braden stated the Defendant told him that M.A wore a "youth bra" and that A.G. had "run in on him one time in the bathroom" and seen him nude. The Defendant said that he bought the victims items at Walmart recently and in the past. He said that his last sexual relationship was fourteen or fifteen months earlier and that he used the condoms to masturbate. He said he did not want to give information about the condoms with his mother

present, but Detective Braden said the Defendant's mother was not in the room when he was asked about the condoms.

Detective Braden testified that the Defendant's mother was "in and out of the house" during the interview. He said that the Defendant did not have any questions about the consent to search form and that he signed it. He said the date and time on the consent to search form was August 17, 2009, at 3:09 p.m. He said the rights waiver form was dated the same day at 2:00 p.m. He said that after the consent form was signed, they searched the residence and bedroom. He said they removed bedding, a computer, and condoms from the Defendant's bedroom. He said he obtained a second consent to search form for the computer, hard drive, and files.

Detective Braden testified that when the Defendant told officers that he passed the voice stress analysis in Franklin and learned what the allegations were in this case, he and his mother asked if he could take a polygraph to clear himself. Detective Braden said that the Defendant discussed taking a polygraph examination at least three times before the assistant district attorney arrived and that he wanted to take it as soon as possible. He stated that the Defendant's mother told the Defendant more than once that if he had not done anything, he had no reason to worry and that he should take the polygraph to resolve the matter. Detective Braden said that he did not initiate the discussion about the polygraph but that the Defendant mentioned it.

Detective Braden testified that the assistant district attorney general arrived at the Defendant's house during the search and read the Defendant his rights again. Detective Braden said that the Defendant appeared to understand his rights and that the assistant district attorney read the rights verbatim as they appeared on the waiver. Detective Braden said that the assistant district attorney stayed thirty-five minutes, left, and called back to ask him if the Defendant was still interested in taking a polygraph examination. He said that the Defendant and his mother wanted the Defendant to take the polygraph to "clear this up and get it done" and that he told the Defendant a polygraph was set for the next day, August 18, 2009 at 11:00 a.m. He said that he left the Defendant's house sometime after 5:00 p.m., a few minutes after scheduling the polygraph, and that the Defendant knew the officers took some of his property but was not distraught.

Detective Braden testified that he learned that the Defendant arrived at the police station sometime around 10:45 a.m. on August 18, 2009, and that he went to the lobby to acknowledge the Defendant was there for the polygraph. He stated that he told the Defendant that they were still preparing, that Agent Smith was running late, and that he would meet with the Defendant when things were ready. He said the Defendant did not express dissatisfaction over having to wait, express a desire to leave, or express an

unwillingness to take the polygraph. He said that he did not tell the Defendant that he could not leave and that he did not mention the polygraph when he went to the lobby.

Detective Braden testified that he had no contact with the Defendant from 10:45 a.m. until around noon, when Agent Smith arrived. He said that he took the Defendant back to the interview room and that Agent Smith read and reviewed the consent to polygraph form with the Defendant. He said that the Defendant and Agent Smith signed the form, that he signed it as a witness, and that it was dated August 18, 2009 at 12:11 p.m. He said that Agent Smith reviewed the *Miranda* waiver with the Defendant and that this was the third time in twenty-four hours that the Defendant's rights had been reviewed with him. He said the *Miranda* waiver was signed by the Defendant and witnessed by Agent Smith and him and that it was signed at 12:18 p.m. He said that after the forms were signed, he left the room and observed the polygraph examination through the one-way window. He said that during the Defendant's first break, he told the Defendant that there were restrooms and a water fountain in the lobby and that the Defendant was not in custody when he went to the lobby alone during any of his breaks. He said that after the polygraph examination, the Defendant went to the lobby while Agent Smith calculated the results of the polygraph. He said that when the Defendant returned to the interview room, Agent Smith told him that he had shown "strong deception," that the Defendant did not show much reaction, and that Agent Smith explained the difference between situational and preferential sexual offenders.

Detective Braden testified that the Defendant did not demand a lawyer. He said that the mention of a lawyer "sounded more like a question" and that it was casual. He stated that the Defendant said "he might need to talk to his mom or a lawyer." He said that the Defendant never asked specifically for his mother or a lawyer. He said that Agent Smith told the Defendant that anything he said was voluntary and that he was free to leave. Detective Braden said he moved two or three feet further from the door to clear a path for the Defendant. He stated that after the Defendant said the girls could not hide the story long, Agent Smith asked the Defendant if he still understood his rights and that the Defendant said he did. Detective Braden said the Defendant continued talking, admitted touching M.A. and A.G. sexually, and stated that "he had licked [the victims] in their private area and touched them with his finger." He said that he and Agent Smith were not asking questions but that they had the Defendant pause after the admissions. He said that he asked the Defendant if he could record his statement to obtain a full account. He said that the Defendant agreed to the recording, that he retrieved the recording equipment, that he reviewed the Defendant's *Miranda* rights again, and that the Defendant signed the waiver. The Defendant's recorded statement was entered as an exhibit.

Detective Braden testified that the Defendant was in custody and was not free to leave after completing the recorded statement around 5:20 p.m. He said that after the recorded

statement was taken, he took the Defendant's written statement, which ended about 5:40. He said he reviewed the written statement with the Defendant and allowed him to read it and sign it, finishing around 5:50 or 5:55 p.m. He said another detective learned that defense counsel was at the police station at 5:48 p.m., which was after the Defendant gave his statement but while he reviewed it and before he signed it. He said the Defendant had not been formally charged at that time. He said that defense counsel was brought to the interview room after the Defendant signed his statement.

Detective Braden testified that defense counsel stayed in the interview room fifteen to twenty minutes. He said that when counsel left the room, counsel asked if he was going to charge the Defendant. He said he told counsel that the Defendant would be charged. He stated that after the meeting, counsel went to the front of the police station and that the Defendant was taken to the Marshall County jail and charged around 6:32 p.m.

On redirect examination, Detective Braden testified that he was instructed not to arrest the Defendant the day of the polygraph in order to provide more time to investigate. He said that after the Defendant gave a full account, he did not feel the Defendant was free to leave. He said that the Defendant's statement was written but that he was unsure if the Defendant had signed the statement when he received word that counsel was in the police station lobby.

TBI Special Agent Criminal Investigator Michael Smith testified for the State that he was a certified polygraph examiner and that at work, he spent about ninety percent of his time conducting forensic polygraph examinations and the interviews associated with the polygraphs. He said that he scheduled a polygraph examination of the Defendant with the assistant district attorney general for August 18, 2009, at 11:00 a.m. but that heavy traffic made him late. He said that he arrived around 12:00 p.m., that Detective Braden brought the Defendant to the interview room where he prepared the polygraph equipment, and that he introduced himself and began the pretest interview. He said Detective Braden was in the room for ten to fifteen minutes as a witness for the polygraph consent and the rights waiver forms. He stated that during the pretest interview, he reviewed the consent form prescribed by the State Polygraph Commission, that the Defendant signed the form, that he signed as a witness, and that he wrote the time, 12:11 p.m., on the form. He said he noted on the form that the Defendant did not want the polygraph examination recorded. He said he also reviewed the TBI's *Miranda* rights waiver with the Defendant. The form was dated August 18, 2009, and the time noted was 12:18 p.m, when the interview concluded. He said he confirmed the Defendant could read, asked for a verbal response to each question, and had the Defendant initial each answer. He said Detective Braden left the room after the two forms were completed.

Agent Smith testified that he continued with the next phase of the pretest interview, the suitability assessment. He obtained background information, assessed whether the Defendant was competent to take the polygraph, and asked medical questions to determine if there were issues that would interfere with the polygraph. He said the Defendant told him his birth date and address and about passing the voice stress analysis. He said the Defendant told him he was a high school graduate, had a Christian family background, was home schooled, and had studied law enforcement at Nashville Tech for one and one-half years. He said the Defendant told him that he was not under a doctor's care for medical problems. He stated that the Defendant said he had Tourett Syndrome and suffered from "tics" but that it was a neurological condition that did not affect "intelligence or anything of that nature." The Defendant said that he had not had any drugs, alcohol, or tobacco in the last twenty-four hours and that he had eaten that morning.

Agent Smith testified that after the suitability assessment phase, he explained the polygraph technique and instrument to the Defendant. He said that he reviewed the case file and that the Defendant denied the allegations. He said that he reviewed the questions he would ask and explained procedural testing instructions such as how to sit. He said that they took a break from approximately 1:15 to 1:30 and that he stayed in the room setting up equipment after the Defendant left the room.

Agent Smith testified that after the Defendant returned from the break, they began the in-test phase. He said that he did two series because there were two victims and that there were three charts done for each victim. He said that the first test concluded at 2:14 p.m., that they took a break, and that he did not think they left the room. He said that the second test concluded at 2:41 p.m and that they took a break from approximately 2:45 to 3:05, during which time he printed, scored, and analyzed the charts.

Agent Smith testified that the Defendant returned to the interview room at 3:05 p.m. and signed the polygraph report. He said Detective Braden came to the interview room also. He said that during the post-test interview, he told the Defendant that the Defendant had a "significant problem on the test" and that the test "showed deception." He said he discussed the case file and victims' statements with the Defendant. He told the Defendant that in his opinion, there was a strong likelihood the Defendant did the things of which the victims accused him and that he needed to tell the truth about what happened. Agent Smith said he discussed situational and preferential pedophiles with the Defendant. He explained that preferential offenders were sexually stimulated only by children and that situational offenders had more normal social relationships and had inappropriate sexual contact with children usually when they were under stress and lost control. He said that he asked the Defendant which type he was and that the Defendant said he was a situational offender. He stated that the Defendant said that he knew it was wrong, that he had a conscience, that it was impulse,

and that he "might need to talk to my mama and a lawyer." Agent Smith said that he paused and waited for the Defendant to invoke his right to a lawyer or to terminate the interview but that he did not. He said that he told the Defendant that anything he said was voluntary, that he was not under arrest, that the door was not locked, that he was free to leave, and that he could talk to his mother or a lawyer. He said that neither he nor Detective Braden asked the Defendant any questions but that the Defendant started talking. The Defendant said that he was going to be held accountable for his actions, that he was ready to accept responsibility, that he did not want to be this type of person, that he did not want to go to jail but had to "take the rap" for what he did, that he wanted to apologize but was uncertain the victims would forgive him, that he could not control "it," that he was not gay, and that he had a girlfriend previously.

Agent Smith testified that after the Defendant made those statements, he asked the Defendant what happened from his perspective. He stated that the Defendant said he engaged in sexual activity with M.A. on two occasions in July 2009 at the Defendant's house after church. He stated that the Defendant told him that he rubbed and licked M.A.'s vagina, that M.A. had "masturbated him and ejaculated his penis," and that he rubbed his penis on M.A's vagina. He stated that the Defendant said he engaged in sexual activity with A.G. on two occasions in July 2009 at the Defendant's house after church. He stated that the Defendant told him that he licked A.G.'s vagina, that he rubbed A.G's vagina on the inside of her "vagina lips," and that A.G. touched his penis and rubbed his penis with her lips until he ejaculated. Agent Smith said the post-test interview ended about 4:45 p.m. He said Detective Braden obtained a written statement and a recorded interview. He said that he was present when Detective Braden read the Defendant his rights, that he was in and out of the room during the recorded and written statements, and that Detective Braden finished with the statements about 5:45 to 6:00 p.m.

On cross-examination, Agent Smith testified that defense counsel arrived before he left the police station. He said that a few minutes elapsed between Detective Braden's learning of defense counsel's presence and counsel's being allowed to see the Defendant and that counsel was not allowed back until the Defendant completed his statement. He said that he told the Defendant he needed to tell the truth and resolve this before it went further, not that if he told the truth the case would not go further. He said he did not discuss jail with the Defendant. He said that the Defendant ate in the late afternoon and that he thought it was while the confession was being recorded.

On redirect examination, Agent Smith testified that he did not tell the Defendant that he would not go to jail if he talked, that he would get a reduced sentence, or that he would not be arrested. He said that he never told the Defendant the amount of time that he might serve.

Lewisburg Police Detective James Johnson testified that he received a telephone call from dispatch regarding defense counsel's attempts to reach his client on August 18, 2009. He said that the assistant district attorney was with him and advised him to note the time of the call. He said he noted the call came at 5:48 p.m.

On cross-examination, Detective Johnson said that the assistant district attorney told him to tell Detective Braden that defense counsel was outside. He said that he did not go into the interview room because he did not want to interrupt the interview and that he told Detective Braden counsel was there when Detective Braden came out of the room. He did not remember how long he waited to tell Detective Braden that counsel was outside. He said he received a second call about 5:58 p.m. informing him that counsel wanted to see his client and admitted he had not told Detective Braden that counsel was outside since the first call. He said he received a third call about 6:05 p.m. informing him again that counsel was outside, but he could not remember if Detective Braden had come out of the interview room and been informed of counsel's presence before this call. He said he did not recall any discussion about waiting until the interview was complete to allow counsel to see the Defendant.

Debbie Stewart Harris, the Defendant's mother, testified for the defense that she arrived late for the Defendant's polygraph examination and that she brought him lunch around 3:30 p.m. She said she stayed at the police station throughout the afternoon.

The Defendant testified that he arrived at the police station for his polygraph examination around 11:00 a.m. on August 18, 2009, and that he agreed to take a polygraph to prove he did not commit the alleged acts. He said he drove himself to the police station, went into the lobby, and asked the dispatcher to inform Detective Braden that he was there. He said that Detective Braden told him that Agent Smith would be late and that he waited a while. He said Detective Braden took him to the interview room after Agent Smith arrived. He reviewed the polygraph consent and the *Miranda* rights waiver forms with Agent Smith and signed the waivers. He said that he answered questions about his health, that he told Agent Smith that his Tourett Syndrome caused him to jerk and flinch, and that he was concerned because the test analyzed based on movements and breath. He stated that Agent Smith said it was "fine" and that he went along with it.

The Defendant testified that he was given two examinations and that he took a break in the middle. He said that he left the interview room about three times during the day, that he never left and roamed the police station alone, and that Detective Braden opened the door and escorted him out. He said that he used the restroom in the lobby the first few times and that he used the restroom in the back near the interview room the last few times. He said that Detective Braden accompanied him into the restroom and asked if he was okay. He said that

-31-

before the polygraph, he was asked to wash his hands with warm water and soap and that he went to the restroom in the lobby. He said Detective Braden accompanied him to the front lobby and opened the door for him. He said that he went into the restroom alone but that Detective Braden came into the restroom while he was washing his hands and asked if he was ready. He said that during one of the restroom breaks, he was sent to the lobby by himself and that when the break was over, Detective Braden opened the secured door.

The Defendant testified that after the polygraph examination and a break, Agent Smith told him that the polygraph showed high signs of deception and that Agent Smith believed he was lying. He said Agent Smith used a computer to explain situational and preferential offenders to him. He stated that Agent Smith said the assistant district attorney needed to know which type of offender he was and that he told Agent Smith he was a situational offender. He said that he thought he had to choose one of the two. He said that after Agent Smith told him he showed signed of deception, he said, "I would like to talk to my mom and an attorney." He stated that Detective Braden interrupted him and said that Agent Smith was going to talk to the assistant district attorney and that it would look bad if he did not talk now. He said that he told them he wanted to talk to his attorney first to make sure he was doing the "right thing" but that they never stopped talking and persuading him. He said that after he told them he wanted to speak to his mother and an attorney the third time, he reached for his cell phone, which was on the interview table, but that Detective Braden took it and put it on the filing cabinet behind him. He said he felt like they did not want him to use his phone to call his mother. He said that after he asked for his mother and an attorney, he left the interview room once, when Detective Braden escorted him to the restroom in the back. He said his cell phone was not returned to him until after he met with counsel in the interview room, when he retrieved the phone from the file cabinet and gave it to counsel to give to his mother for safekeeping. He said that they told him he was in a "whole lot of trouble" and that the best thing to do was to talk to them first and to his attorney later. He said he did not receive the food his mother brought to the police station until after he gave his statements.

The Defendant testified that he gave the recorded statement before the written statement. He said he did not know counsel was waiting in the lobby until he saw counsel in the interview room. He said that if he had known his mother had hired counsel and counsel was waiting in the lobby, he would have wanted to talk to them to determine how to proceed. He said that they told him he was free to leave earlier in the day but that after he failed the polygraph and the questioning began, they did not say he was free to leave and continued asking questions. He said that the officers did not tell him he was free to leave after he asked to speak to his mother and an attorney. He said that he was told polygraph examinations were not usually recorded, that they could be, but that setting up the recording

-32-

equipment would take time. He said that because he had already waited a long time, he told them he did not want the polygraph recorded.

On cross-examination, the Defendant testified that he agreed to take a polygraph when officers were at his house on August 17, 2009, but that he did not mention the polygraph multiple times. He said that he had one and one-half years of post-high school education, that he changed his major to criminal justice during that time, and that he did not study polygraphs but knew what they were. He said he learned what a voice stress analysis test was when he took one in Franklin. He said that he knew the polygraph was voluntary and that he thought he would pass it. He stated that he had studied *Miranda* rights in college coursework but that he learned about them eight years earlier. He said he worked as a correctional officer for the Rutherford County Sheriff's Department but resigned because of his Tourett Syndrome. He said that he knew no one could take his rights away from him but that because he was under pressure and had Tourett Syndrome, he was not thinking clearly. He said that he went through two days of interrogation at two different police departments and that he confessed at the end of the second day because the police persuaded and intimidated him. He said the police did not record his interview because they had something to hide but agreed that he told the officers he did not want his polygraph recorded. He said a recording would have verified that he asked for an attorney multiple times. He said he did not tell the officers he wanted an attorney while his statement was being recorded because he knew it could be recorded over, he had told his story multiple times, and he was tired.

The Defendant testified that the officers asked him for details and that he told them what they wanted to hear because he wanted it to be over. He said he was ashamed of being at the police station and knew his mother would be upset. He thought that if he confessed, he might receive probation or a "break" from the assistant district attorney. When explaining what the officers said to intimidate him, he stated Detective Braden told him that not everyone needed prison and that because he was a situational offender, he could receive therapy or probation instead of prison. He said that when Agent Smith asked him which type of offender he was, Agent Smith stated that if he was a preferential offender, he would go to prison. He stated Agent Smith said that the Defendant's "best bet" was to admit what he did, that Agent Smith wanted to help him because he did not want to see him in prison, and that alternative means existed to help him if he admitted the allegations. He said that Detective Braden read the victim's statements and the allegations to him, asked if he did the acts alleged, told him it would not be good for him if he did not "come clean," and that he was facing a long time in prison. He stated that at his house on August 17, 2009, the assistant district attorney said that he did not believe the Defendant was telling the truth, that if the Defendant did not "come clean," he was going to spend the rest of his life in prison, and that a high bond would be set to keep him in jail.

The Defendant testified that the two officers were lying when they said he was told he could leave after he said he would like to speak to his mother or a lawyer. He said that he did not remember pushing open the door to the lobby himself during his breaks but that he knew the doors to the lobby were unlocked. He said that after the results of the polygraph were explained to him, he asked for a lawyer three times within fifteen to twenty minutes. He stated that in making his first request, he said, "I think I need to talk to my mom and an attorney before I talk to you guys." He said that the officers tried to persuade him "passively" against talking to a lawyer and that he did not feel like he could leave. He said he was under stress because his roommate, Richie Jacowisz, M.A.'s mother's boyfriend, threatened to kill him on August 14 or 15 if he failed the polygraph. He stated that in making his second request, he said, "Before I talk to you guys, I want to talk to my mom or attorney or lawyer or whatever." He said that Detective Braden responded by saying he understood and just wanted the Defendant to talk to them. He stated that in making his third request, he said, "Before I talk to you guys, I want to call my mom, you know, and an attorney." He said that after his third request, he reached for his cell phone on the interview table but that Detective Braden placed the phone on the filing cabinet behind him. He said he felt like he was in custody. He said Detective Braden acted like "Mr. Nice Guy" as if he wanted to help the Defendant.

Agent Smith was recalled and testified for the State that at the end of the interview, he told the Defendant that he was leaving the room to talk to the assistant district attorney. He said that the "therapy issue" was discussed when he explained that situational offenders usually responded to therapy but that preferential offenders did not. He did not remember Detective Braden telling the Defendant that not everyone went to prison if they confessed. He denied hearing Detective Braden discuss therapy with the Defendant or tell the Defendant that the assistant district attorney "had it out for him" and that he was looking at a long time in prison. He stated that the Defendant did not mention his mother or an attorney three times during the post-interview and that the Defendant mentioned them once but used the word lawyer, not attorney. He said he did not remember the Defendant having a cell phone.

Detective Braden was recalled and testified for the State that he read some of the victims' statements during the Defendant's interview to corroborate what the Defendant told them. He denied telling the Defendant that if he did not "come clean," he would serve a long prison sentence. He denied telling the Defendant that not everyone goes to prison and that the Defendant might receive therapy if he told the truth. He denied telling the Defendant that the assistant district attorney was "out for him." He denied hearing the assistant district attorney tell the Defendant while at the Defendant's house that he was going to spend a long time in prison and said the Defendant's mother was outside when the assistant district attorney left the Defendant's house. He denied that the Defendant said he needed to talk to his mother and an attorney before talking to them. He said he did not respond to the

-34-

Defendant by saying that he understood or that it would be better if the Defendant talked. He said that he did not grab the Defendant's cell phone from the interview table.

The trial court found that the Defendant did not make an unequivocal request for an attorney. The court noted that after the Defendant said, "I think I might need to talk to my moma [sic] and a lawyer," Agent Smith took appropriate steps to ensure the Defendant understood his rights. The court also found that the Defendant began giving his written statement to Detective Braden at 5:20 p.m., that they reviewed the statement from 5:50 to 6:00 p.m., that counsel arrived at the police station at 5:48 p.m., and that counsel was allowed access to the Defendant soon after arrival. The court found that the Defendant's Sixth Amendment right to counsel was not violated because counsel was allowed access to the Defendant before the initiation of adversary proceedings.

The United States and Tennessee Constitutions protect a suspect from "being compelled to give evidence against himself." *State v. Berry*, 141 S.W.3d 549, 576 (Tenn. 2004) (citing U.S. Const. amend. V; Tenn. Const. art. I, § 9); *see also State v. Turner*, 305 S.W.3d 508, 515 (Tenn. 2010). If a suspect is in custody and under state-initiated interrogation, the police must first inform him of his Fifth Amendment rights in order for his confession to be admissible as substantive evidence in the trial of the matter. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Encompassed within the federal and state constitutional provisions is the right to counsel. *See id.* at 444. "[A]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Davis v. U.S.*, 512 U.S. 452, 455 (1994). "When a suspect invokes the right to counsel, police must cease questioning until counsel is present or the suspect initiates further conversation with the police. *State v. Saylor*, 117 S.W.3d 239, 244 (Tenn. 2003); *see Miranda*, 384 U.S. at 444-45; *see also Edwards v. Arizona*, 451 U.S. 477 (1981); *State v. Stephenson*, 878 S.W.2d 530, 548 (Tenn. 1994). A suspect who initially waived his right to counsel and contends that he later revoked the waiver bears the burden of proving he revoked the waiver and clearly asserted his right to counsel. *Turner*, 305 S.W.3d at 519.

On review, an appellate court may consider the evidence presented at the suppression hearing as well as at the trial in determining whether the trial court properly denied a pretrial motion to suppress. *State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998). On appeal, a trial court's factual findings in a suppression hearing are conclusive unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 22-23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). The application of the law to the facts as determined by the trial court is a question of law that is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). Whether a suspect's request for an attorney was unequivocal is a mixed question of law and fact that is subject to de novo review. *State*

*v. David Hooper Climer, Jr.*, — S.W.3d —, No. W2010-01667-SC-R11-CD (Tenn. Apr. 19, 2013) (citing *Turner*, 305 S.W.3d at 514-15).

The evidence reflects that the Defendant went to the police station voluntarily for a polygraph examination and was there for several hours. He was questioned in a secured area that he could leave but could not re-enter of his own accord. He was advised of his rights before the polygraph examination began, and he waived those rights in writing. After the polygraph examination, Agent Smith and Detective Braden informed him of the results. According to the officers, the Defendant said he might need to talk to his mother or a lawyer, but before they said anything, he began making inculpatory statements. According to the Defendant, he told the officers he wanted to talk to his mother and an attorney, but the officers continuously talked and persuaded him to talk to them. The trial court credited the officers' testimony. Deferring to the court's factual findings regarding the credibility of the officers' testimony, we conclude that the Defendant's statement he "might" want to talk to his mother or an attorney was not a clear invocation of his right to counsel. *See Climer*, — S.W.3d —, slip op. at 31-33 (stating that the defendant's statement "communicating merely a *potential* desire to consult with counsel and lack[ing] the clarity and definitiveness characteristic of statements deemed unequivocal invocations of the right to counsel" did not require that questioning immediately cease) (emphasis in original)). We note, as well, that after the Defendant made the statement about talking to his mother or an attorney, he, not the police, initiated further discussion. *See State v. Koffman*, 207 S.W.3d 309, 318-19 (Tenn. Crim. App. 2006) (stating that after a defendant invokes his right to counsel, questioning must cease, although a defendant may reopen questioning).

We have not overlooked the evidence that an attorney was present at the police station and asked to talk to the Defendant, but the Defendant was not told the attorney was there. The Defendant had waived his right to counsel and did not seek to revoke his waiver by asking to consult with an attorney. In *Moran v. Burbine*, the United States Supreme Court decided that the police did not violate a murder suspect's Fifth Amendment rights against self-incrimination and to counsel by failing to inform him that an attorney his sister contacted to represent the Defendant on another criminal charge had called for him. 475 U.S. at 475 U.S. 412, 421-22 (1986) ("Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right."); *see also Stephenson*, 878 S.W.2d at 544-47 (holding as a matter of state and federal constitutional law that a suspect's waiver of his *Miranda* rights was not invalidated because the police failed to tell him that an attorney procured by his family wanted to see him), *abrogated on other grounds by State v. Saylor*, 117 S.W.3d 239, 246-47 (Tenn. 2003). The Court also said that no Sixth Amendment violation occurred because the Sixth Amendment right to counsel did not attach until after the initiation of formal charges. *Burbine*, 475 U.S. at 428-32; *cf. McPherson v. State*, 562

S.W.2d 210, 212-13 (Tenn. Crim. App. 1977) (concluding that a defendant who gave oral and written waivers before making a statement without counsel present was not denied his Sixth Amendment right to counsel despite his attorney's request that the police not question the defendant in the attorney's absence). The Court rejected, as well, the proposition that the police conduct violated the defendant's right to fundamental fairness under the Fourteenth Amendment. *Burbine*, 475 U.S. at 432-34. Returning to the facts of the present case, we conclude that the trial court did not err in denying the motion to suppress.

## III

The Defendant contends that the trial court erred in failing to merge some of his aggravated sexual battery convictions to reflect only one conviction per victim for each date. The State counters that the Defendant failed to raise this issue in his motion for a new trial and has not demonstrated that he is entitled to plain error relief. We conclude that the Defendant is not entitled to relief on this basis.

The State argues that the issue is waived because it was not raised in a motion for a new trial. The remedy for a double jeopardy violation is not a new trial, it is dismissal of a charge or merger of convictions. *See, e.g.*, *State v. Addison*, 973 S.W.3d 260, 267 (Tenn. Crim. App. 1997). The issues that may be waived if they are not raised in a motion for a new trial are those upon which a new trial is sought. *See* T.R.A.P. 3(e). The Defendant did not waive the issue.

The Defendant argues that Counts 6, 8, 10, and 12, all of which involve various forms of physical contact with M.A. on July 22, 2009, should be merged. He makes the same argument for Counts 13, 15, and 17, involving various forms of physical contact with A.G. on July 29. He makes the argument, as well, for Counts 19, 21, 23, 25, and 26, involving various forms of physical contact with M.A. on July 29.

The double jeopardy clauses of the United States and Tennessee Constitutions state that no person shall be twice put in jeopardy of life or limb for the same offense. U.S. Const. amend. V; Tenn. Const. art. I, § 10. The clause has been interpreted to include the following protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989); *State v. Phillips*, 924 S.W.2d 662, 664 (Tenn. 1996).

At the time of the offenses and the trial, double jeopardy issues involving multiplicity of offenses, or multiple convictions of a single statute, were evaluated based upon the facts

and circumstances of the case. *See, e.g.*, *State v. Pickett*, 211 S.W.3d 696, 705-06 (Tenn. 2007); *Phillips*, 924 S.W.2d at 665. While the Defendant's appeal was pending, our supreme court decided *State v. Watkins*, 362 S.W.3d 530, 543 (Tenn. 2012), which applied the analytical framework of *Blockburger v. United States*, 284 U.S. 299, 304 (1932), to determine if double jeopardy protections permitted convictions of multiple offenses committed, necessarily, before the *Watkins* decision. In a companion case, the court again applied the *Blockburger* framework to pre-*Watkins* offenses. *See State v. Cross*, 362 S.W.3d 512 (Tenn. 2012). This court has applied the *Blockburger/Watkins* analysis to a double jeopardy claim for offenses committed before the *Watkins* decision. *See State v. Mahlon Johnson*, No. W2011-01786-CCA-R3-CD (Tenn. Crim. App. Feb. 7, 2013). We note, as well, that *Watkins* did not recognize a new constitutional right. Rather, it revised the process for analyzing whether a defendant's previously recognized constitutional right had been violated. We will apply *Watkins* to the Defendant's case.

"In single prosecutions, multiple punishment claims ordinarily fall into one of two categories, . . . referred to as 'unit-of-prosecution' and 'multiple description' claims." *State v. Watkins*, 362 S.W.3d 530, 543 (Tenn. 2012). Unit-of-prosecution claims arise "when defendants who have been convicted of multiple violations of the same statute assert that the multiple convictions are for the 'same offense.'" *Id.* *Watkins* did not involve a unit-of-prosecution claim. In revising the framework for analyzing multiple punishment claims, though, it addressed the analysis for both unit-of-prosecution and multiple description claims. Regarding unit-of-prosecution claims, *Watkins* said that the pertinent analysis involves determining "what the legislature intended to be a single unit of conduct for purposes of a single conviction and punishment." *Id.* (quoting George C. Thomas, *A Unified Theory of Multiple Punishment*, 47 U. Pitt. L. Rev. 1, 11 (1985)). In this endeavor, courts are to "apply the 'rule of lenity' when resolving unit-of-prosecution claims, meaning that any ambiguity in defining the unit of conduct for prosecution is resolved against the conclusion that the legislature intended to authorized multiple units of prosecution." *Id.* (citing *Gore v. United States*, 357 U.S. 386, 391-92 (1958)).

The aggravated sexual battery statute proscribes an act of unlawful sexual contact with a victim. *See* T.C.A. § 39-13-504. By its nature, the proscribed act of touching a victim's intimate parts or a victim's touching a defendant's or another person's intimate parts is a singular occurrence that is complete upon the touching. *See id.* § 39-13–501(6); *cf. Phillips*, 924 S.W.2d at 664 (in a pre-*Watkins* case, noting that separate acts of intercourse generally constituted separate rape offenses). If a touching of a different intimate part occurs, a discreet instance of the proscribed conduct has occurred. We conclude that the legislature's intent in enacting the statute was for each touching of an intimate part to constitute a separate violation of the statute.

Regarding M.A. on July 22, 2009, four counts alleged aggravated sexual battery in which the Defendant touched M.A.'s genital area with his mouth and/or tongue (Count 6), her genital area with his hand and/or finger (Count 8), her buttocks with his hand and/or finger (Count 10), and her genital area with his penis (Count 12). The evidence reflects that all of these events took place when the Defendant, M.A., and A.G. were in the Defendant's bedroom on his bed. The victim testified that the Defendant licked her vagina, touched her "butt," and penetrated her vagina with his finger. When he penetrated her vagina with his penis, he positioned her legs on his shoulders. During the incident, the Defendant took a condom from a drawer and wore it. Each count involved a different combination of the Defendant's and M.A.'s body parts occurring at different times during the incident. We conclude that the evidence demonstrates four distinct instances of aggravated sexual battery. The Defendant is not entitled to have the four aggravated sexual battery convictions merged.

Regarding A.G. on July 29, 2009, three counts allege aggravated sexual battery in which she touched his penis with her hand (Count 13), he touched her vagina with his hand and/or finger (Count 15), and he touched her genital area with his mouth and/or tongue (Count 17). A.G. testified that the Defendant touched her vagina with his finger and tongue, told her to suck his penis, and made her rub his penis with her hand. The Defendant said in his recorded statement that A.G. stimulated him with her hand until he ejaculated, that he removed the condom, and that he licked her genital area. Each count involved a different combination of the Defendant's and A.G.'s body parts occurring at different times during the incident. The evidence demonstrates three distinct instances of aggravated sexual battery. The Defendant is not entitled to merger of these convictions.

Regarding M.A. on July 29, 2009, five counts allege aggravated sexual battery in which he touched her genital area with his mouth and/or tongue (Count 19), her genital area with his hand and/or finger (Count 21), her buttocks with his hand and/or finger (Count 23), her breast with his hand and/or finger (Count 25), and her buttocks with his mouth and/or tongue (Count 26). As we discussed in Section I, the evidence is insufficient to support the conviction for Count 26, and we will not discuss it here. As to the four remaining counts, M.A. testified that the Defendant licked her "pee pee," touched her genital area with his fingers, touched her buttocks with his hand, and touched her chest with his hand. The Defendant admitted in his written statement that he touched M.A.'s clitoris and inside her vaginal lips with his finger. He admitted in his recorded statement that he touched and rubbed her private area including her clitoris, although he denied penetrating her vagina. Each count involved the Defendant's touching a distinct body part with his hand or finger, and the evidence demonstrated that the events occurred as a sequence of acts. We conclude that the evidence established four separate instances of aggravated sexual battery and that the Defendant is not entitled to merger of these counts.

**IV**

Although not raised by the parties, we have considered as a matter of plain error whether the court should have merged eight of the aggravated sexual battery convictions into eight of the rape of a child convictions. *See* T.R.A.P. 36(b) (plain error). This issue involves the counts of aggravated sexual battery that occurred immediately before the Defendant sexually penetrated the same body part of the same victim and during the same incident. There are two possible constitutional concerns: double jeopardy and due process.

**A. Double Jeopardy**

At the time of the offenses and the trial, double jeopardy questions involving convictions of different statutes were considered under the framework provided in *State v. Denton*, 938 S.W.2d 373 (Tenn. 1996), *abrogated by Watkins*, 362 S.W.3d 530. While the Defendant's appeal was pending, the supreme court decided *Watkins*. The question arises whether the *Denton* analysis, applicable at the time of the offenses and the Defendant's trial, should apply, or whether the current *Watkins* analysis should be employed. For the reasons we discussed above, we will apply *Watkins* to the Defendant's case.

*Watkins* holds that *Blockburger* provides the applicable test for determining whether multiple convictions under different statutes constitute the same offense for double jeopardy principles. *Watkins*, 362 S.W.3d at 558. When the "same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not." *Blockburger*, 284 U.S. at 304. Our supreme court has stated that "the *Blockburger* test requires an examination of the statutory elements in the abstract, without regard to the proof offered . . . in support of the offenses." *Watkins*, 362 S.W.3d at 544 (citing *State v. Dixon*, 509 U.S. 688, 696 (1993)).

First, though, the court must first determine whether the convictions arise from the same act or transaction. *Id.* at 545. In the present case, the following convictions are of concern:

1. Count 4, aggravated sexual battery involving the Defendant's touching A.G.'s genital area with his mouth or tongue, and Count 3, rape of a child involving the Defendant's performing cunnilingus on A.G. on July 22.
2. Count 6, aggravated sexual battery involving the Defendant touching M.A.'s genital area with his mouth or tongue, and Count 5, rape of a child involving cunnilingus of M.A. on July 22.

3.    Count 8, aggravated sexual battery involving the Defendant's touching M.A.'s genital area with his hand or finger, and Count 7, rape of a child involving digital penetration of M.A's genital area on July 22.

4.    Count 12, aggravated sexual battery involving the Defendant's touching M.A.'s vagina with his penis, and Count 11, involving penile penetration of M.A.'s vagina on July 22.

5.    Count 15, aggravated sexual battery involving the Defendant's touching A.G.'s genital area with his hand and/or finger, and Count 14, rape of a child involving digital penetration of A.G.'s genital area on July 29.

6.    Count 17, aggravated sexual battery involving the Defendant's touching A.G.'s genital area with his mouth and/or tongue, and Count 16, rape of a child involving cunnilingus of A.G. on July 29.

7.    Count 19, aggravated sexual battery involving the Defendant's touching M.A.'s genital area with his mouth and/or tongue, and Count 18, rape of a child involving cunnilingus of M.A. on July 29.

8.    Count 21, aggravated sexual battery involving the Defendant's touching M.A.'s genital area with his hand and/or finger, and Count 20, rape of a child involving the Defendant's digital penetration of M.A. on July 29.

For each of these groupings, the Defendant's touching the victims was prefatory to the penetration, and the touching and the penetration were contemporaneous and involved the same body parts. Each grouping of convictions involve the same act or transaction.

Because these groupings involve the same act or transaction, we move to the second step of the *Blockburger/Watkins* analysis. *See id.* at 557. "If the elements of the offenses are the same, or one offense is a lesser included of the other, then we will presume that multiple convictions are not intended by the General Assembly and that multiple convictions violate double jeopardy." *Id.* As we noted in Section I of this opinion, the elements of rape of a child involve unlawful sexual penetration of a victim who is more than three years of age but less than thirteen years of age. T.C.A. § 39-13-522(a). The elements of aggravated sexual battery involve unlawful sexual contact between a victim and a defendant, and the victim is less than thirteen years old. *Id.* § 39-13-504(a)(4). Sexual penetration means intrusion into a person's body and does not require that the purpose be for sexual arousal or gratification, and sexual contact means touching but not necessarily intrusion and requires that the purpose be for sexual arousal or gratification. *Compare id.* § 39-13-501(7) (sexual penetration) *with id.* § 39-13-501(6) (sexual contact). We conclude that the elements of aggravated sexual battery and rape of a child are not the same.

*Blockburger* also requires consideration of whether one offense is a lesser included offense of the other. *Watkins*, 362 S.W.3d at 557. Lesser included offenses are defined by Tennessee Code Annotated section 40-18-110(f) and (g) (2012). The statute does not classify aggravated sexual battery as a lesser included offense of rape of a child. *See* T.C.A. § 40-18-110(f), (g). Tennessee Code Annotated section 40-18-110(g)(3) provides, "Sexual battery and sexual battery by an authority figure are lesser included offenses of rape and aggravated rape." Similarly, Code section 40-18-110(g)(4) (2012) provides, "Aggravated sexual battery is a lesser included offense of aggravated rape." Thus, neither of these statutory provisions directly addresses whether aggravated sexual battery involving a child is a lesser included offense of rape of a child. We note that the offense that is now rape of a child was previously a category of aggravated rape but was recodified in a separate subsection of the Code, albeit before the enactment of Code section 40-18-110(g). *See* T.C.A. §§ 39-13-502 (2010), Sent'g Comm'n Cmts.; 39-13-522 (rape of a child). We likewise note that both aggravated rape and rape of a child involve the same conduct–unlawful sexual penetration of a victim. In the case of aggravated rape, there are various alternatives that qualify unlawful sexual penetration of a victim as aggravated rape. *See id*. § 39-13-502. In the case of rape of a child, the qualifier is that the unlawful sexual penetration occur to a child. *See id.*, § 39-13-522. Nevertheless, Code section 40-18-110(f) and (g) took effect on July 1, 2009, and the offenses in this case occurred after that date, on July 22 and 29, 2009. The legislature expressly provided the means for determining lesser included offenses, and it excluded aggravated sexual battery as a lesser included offense of rape of a child. We are obligated to follow its pronouncements. *Cf. State v. David Lynn Harrison*, No. E2008-01082-CCA-R3-CD (Tenn. Crim. App. Aug. 17, 2010) (applying law as it existed at the time of the offense, not the subsequent statutory enactment, to determine whether an offense was a lesser included offense of another).

Because the elements of aggravated sexual battery and rape of a child are not the same and neither is a lesser included offense of the other, we conclude that the legislature intended to permit multiple punishments and that they are not the same offense for double jeopardy purposes. The Defendant is not entitled to relief on this basis.

## B. Due Process

Despite there being no double jeopardy violation for convictions of aggravated sexual battery and rape of a child, multiple convictions cannot be permitted if they offend due process. Multiple convictions offend due process if one is "essentially incidental" to the other. *See, e.g.*, *State v. Barney*, 986 S.W.2d 545, 548 (Tenn. 1999). Regarding sexual offenses, the Tennessee Supreme Court stated in *Barney* that

if the act in question directly facilitates or is merely incidental to the accompanying sexual conduct (such as, for example, applying lubricant to the area of intended copulation), convictions for both acts would be barred. If, however, the act in question is 'preparatory' only in the sense that it is intended to sexually arouse either the victim or the perpetrator, separate convictions are not barred.

*Id.* at 548 (citations omitted). The court stated that the following factors were relevant in determining whether "conduct is directly facilitative, and thus incidental, or merely preparatory in the sense of intending to arouse the victim or perpetrator":

1. temporal proximity--the greater the interval between the acts, the more likely the acts are separate;
2. spatial proximity--movement or re-positioning tends to suggest separate acts;
3. occurrence of an intervening event--an interruption tends to suggest separate acts;
4. sequence of the acts--serial penetration of different orifices as distinguished from repeated penetrations of the same orifice tends to suggest separate offenses; and
5. the defendant's intent as evidenced by conduct and statements.

*Id.* at 548-49.

In the present case, each of the previously identified rape of a child offenses occurred within moments of its accompanying aggravated sexual battery offense. As to each pair, there was no repositioning. They involved the same body parts. The touching was part of the further effort to penetrate the victim. The nature of the conduct and the Defendant's statements support a conclusion that the Defendant had an intent to engage in sexual activity, which he accomplished by touching a victim as a preparatory act to penetrating her. We conclude that the aggravated sexual battery offenses were facilitative of, and thus incidental to, the rape of a child offenses. Due process prohibits dual convictions, and the offenses must be merged.

The following convictions are affected:

1. Count 4, aggravated sexual battery involving the Defendant's touching A.G.'s genital area with his mouth or tongue, should have been merged with Count 3, rape of a child involving the Defendant's performing cunnilingus on A.G. on July 22. The evidence demonstrates that the

-43-

Defendant's touching A.G.'s genital area with his mouth and/or tongue involved the same conduct, body parts, and time as his performing cunnilingus on her.

2. Count 6, aggravated sexual battery involving the Defendant's touching M.A.'s genital area with his mouth or tongue, should have been merged with Count 5, rape of a child involving cunnilingus of M.A. on July 22. The evidence demonstrates that the Defendant's touching M.A.'s genital area with his mouth and/or tongue involved the same conduct as his performing cunnilingus on her.

3. Count 8, aggravated sexual battery involving the Defendant's touching M.A.'s genital area with his hand or finger, should have been merged with Count 7, rape of a child involving digital penetration of M.A's genital area on July 22. The evidence does not establish that the Defendant's conduct constituted two separate offenses, rather than his touching her being incidental to the penetration.

4. Count 12, aggravated sexual battery involving the Defendant's touching M.A.'s vagina with his penis, should have been merged with Count 11, involving penile penetration of M.A.'s vagina on July 22. The evidence does not establish that the Defendant's conduct constituted two separate offenses, rather than his touching her being incidental to the penetration.

5. Count 15, aggravated sexual battery involving the Defendant's touching A.G.'s genital area with his hand and/or finger, should have been merged with Count 14, rape of a child involving digital penetration of A.G.'s genital area on July 29. The evidence does not establish that the Defendant's conduct constituted two separate offenses, rather than his touching her being incidental to the penetration.

6. Count 17, aggravated sexual battery involving the Defendant's touching A.G.'s genital area with his mouth and/or tongue, should have been merged with Count 16, rape of a child involving cunnilingus of A.G. on July 29. The evidence demonstrates that the Defendant's touching A.G.'s genital area with his mouth and/or tongue involved the same conduct as his performing cunnilingus on her.

7. Count 19, aggravated sexual battery involving the Defendant's touching M.A.'s genital area with his mouth and/or tongue, should have been merged with Count 18, rape of a child involving cunnilingus of M.A. on July 29. The evidence demonstrates that the Defendant's touching M.A.'s genital area with his mouth and/or tongue involved the same conduct as his performing cunnilingus on her.

8.      Count 21, aggravated sexual battery involving the Defendant's touching M.A.'s genital area with his hand and/or finger, should have been merged with Count 20, rape of a child involving the Defendant's digital penetration of M.A. on July 29. The evidence does not establish that the Defendant's conduct constituted two separate offenses, rather than his touching her being incidental to the penetration.

The trial court should have merged these convictions as a function of due process, and its failure to do so is plain error. The judgments for all of these counts must be vacated, and the trial court should enter a single judgment for each pair, noting merger of the convictions as noted above.

**V**

The Defendant contends that his effective fifty-year sentence is excessive. The State counters that the Defendant has waived the issue because his brief does not provide adequate argument, citations to authority, and references to the record, and that in any event, the Defendant has failed to show that the sentence is improper. We conclude that the Defendant is not entitled to relief.

The Tennessee Supreme Court adopted a new standard of review for sentencing in *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). Currently, length of sentence "within the appropriate statutory range [is] to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* at 707. In determining the proper sentence, the trial court must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; *see State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986).

Challenges to a trial court's application of enhancement and mitigating factors are reviewed under an abuse of discretion standard. *Bise*, 380 S.W.3d at 707. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of

-45-

sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Id.*

At the sentencing hearing, Charles Brandon testified that he prepared the presentence report. The report reflected that the twenty-eight-year-old Defendant had no prior criminal record and had a pending sexual exploitation of a minor charge. He had "multiple write up/disciplinaries" from his pretrial detention at the county jail. He was a high school graduate and had completed some college work. He reported his mental health as "good" and had been evaluated for competency to stand trial. A medical doctor's letter attached to the report stated that he was diagnosed with mild Tourett Syndrome at age eight. He began using alcohol around age fifteen and stated he was a social drinker. He used marijuana from ages sixteen until twenty-four but quit due to his employment. His prior employment included apartment maintenance, stagehand, and Sheriff's Department detention employee.

Estelle Ray, the Defendant's grandmother, testified that she had known the Defendant since his childhood. She said he had Tourett Syndrome, a brain disorder that caused uncontrollable movements, grunts, and noises. She said he was diagnosed around age three and took medication. She said he had difficulty transitioning from private to public school because he was bullied and finished his secondary education through home schooling. She said the Defendant was industrious and worked from a young age. She said he was kind and helpful. She was surprised when she learned of the allegations and said they were out of character for him.

Candhl Williamson, the Defendant's younger sister, testified that the Defendant was outgoing and helpful, particularly to elderly people. She was surprised by the allegations and said they were inconsistent with his lifestyle. She said that people sometimes made fun of the Defendant due to his Tourett Syndrome. She said he had attended church regularly since he was sixteen.

Amanda Miller testified that she and the Defendant had been friends for thirteen years and had been neighbors. She said that she had never had any concerns about the Defendant being around her children, who were nine-and-one-half and three years old. She said her brother was the Defendant's best friend but that he was unable to attend the hearing because he was a Marine. She said the Defendant was always helpful to her when they were neighbors. She was surprised by the allegations and would not have allowed her children around him if she had held any concerns.

In imposing the sentences, the trial court stated that it had considered the evidence, the presentence report, the arguments and alternatives regarding sentencing, the nature and characteristics of the conduct, the statutory mitigating and enhancement factors, and the

Defendant's potential or lack of potential for rehabilitation. The court found no applicable statutory mitigating factors. It noted the Defendant's diagnosis of Tourett Syndrome but found that it did not impact the crimes. Regarding the enhancement factors, the court found that the Defendant had a prior history of criminal behavior based upon the evidence of his marijuana usage. *See* T.C.A. § 40-35-113(1) (2010) (amended 2012). It also found that the Defendant possessed or employed a firearm during the commission of the offense based upon the evidence that the victims were afraid of the handgun on the night stand. *See id.* § -113(9). The court found that the Defendant abused a position of trust, noting that he was a family friend of both victims, that he used the church youth group as a means to access the victims, that he gave gifts to the victims, that he essentially babysat them, and that he used his friendship with the victims' mothers to mislead them both into believing the other had consented to the victims' spending the night at his house. *See id.* § -113(14). The trial court set the Defendant's sentences for the Class B felonies at the maximum of twelve years each, to be served at 100% as a violent offender. For the rape of a child convictions, the trial court imposed twenty-five-year sentences to be served at 100% as a child rapist, as required by the statute in effect at the time. *See* T.C.A. § 39-13-522(a)(2)(A) (2010) (amended 2011). The eleven month, twenty-nine day sentence for exhibiting harmful material to a minor was the length required by statute. *See id.* §§ 40-35-111(e)(1) (2010), 40-35-302(b) (2010) (amended 2011, 2012).

In imposing partially consecutive sentences, the trial court found that the Defendant was convicted of two or more statutory offenses involving sexual abuse of a minor. *See* T.C.A. § 40-35-115(5) (2010). The court noted the involvement of two victims, the number of offenses, the different types of sexual abuse involved, and the relationship between the victims and the Defendant. It noted that the time span of the abuse was about a week, although the victims did not immediately reveal the abuse to law enforcement. It also noted that no proof existed regarding the extent of any mental and physical damage to the victims. The court also found that the Defendant was an offender whose record of criminal activity was extensive. *See id.* § -115(4). The court relied on the conviction offenses to support its finding in this regard. The court imposed the sentences for each victim concurrently but consecutively as to the victims separately, for an effective fifty-year sentence.

The State contends that the Defendant has waived appellate review of the trial court's sentencing decision because his brief is inadequate and that it cannot respond adequately to an undefined and unsupported argument. We agree with the State that the Defendant failed to include any citations to the record, and we note that the argument provided is of a general nature that the sentences were not appropriate under the facts of the case. The Defendant has not identified any specific component of the trial court's ruling as erroneous or any specific facts that compel a different result. The Defendant's citations to authority are of a general

nature, as well. Although we understand the State's dilemma in responding to the appellant's brief, we will address the issue.

There is no justiciable issue regarding the length of the rape of a child and exhibiting harmful material to a minor sentences because they were the length required by statute. Regarding the twelve-year sentences for aggravated sexual battery, the Defendant has not identified any principles or factors that the court considered inappropriately or failed to consider. Although we doubt the applicability of enhancement factor (9) regarding the Defendant's use of a firearm during the commission of the offense despite the lack of proof that the Defendant positioned the handgun on the nightstand or otherwise employed it in order to intimidate the victims during the offense, misapplication of an enhancement factor does not equate with an abuse of discretion in sentencing, provided there are "other reasons consistent with the purposes and principles of sentencing, as provided by statute[.]" *See Bise*, 380 S.W.3d at 706. We note the trial court's consideration of the relevant statutory guidelines and its findings regarding other enhancement factors, particularly its emphasis on the Defendant's abuse of trust in order to facilitate the crimes. We conclude that the trial court did not abuse its discretion in sentencing the Defendant to twelve years for each aggravated sexual battery conviction.

The remaining question is the propriety of consecutive sentencing. The determination of concurrent or consecutive sentences is a matter left to the discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion. *State v. Blouvet*, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997). Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b) (2010), which states in pertinent part that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that:

> (4) The defendant is an offender whose history of criminal activity is extensive
> . . .
> [or]
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

Only one criterion is needed to support consecutive sentences. *State v. Mickens*, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003).

-48-

The trial court based its finding of extensive criminal activity on the offenses in the present case, not any prior history of criminal activity. This court has interpreted the extensive criminal activity classification as applying to defendants who have an extensive prior history of criminal behavior, not just an extensive number of convictions before the court at sentencing. *See, e.g.*, *State v. Palmer*, 10 S.W.3d 638, 648 (Tenn. Crim. App. 1999). This classification does not apply to the Defendant.

Regarding the multiple sexual offender classification, the record reflects that the Defendant's convictions involve more than one victim. The trial court considered the factors listed in section 40-35-115(b)(5) and concluded that the aggravating circumstances of the relationship between the Defendant and the numerous violations on multiple occasions warranted partial consecutive sentencing. The evidence supports the trial court's ruling. Because the multiple sexual offender classification supports consecutive sentencing, the Defendant is not entitled to relief.

## VI

The State notes in its brief that the judgment for Count 6 contains a clerical error because it states that the sentence is to run concurrently with "Counts 6-8," although the record otherwise reflects that the court's intent was for the sentence for Count 6 to be served concurrently with Counts 5, 7, and 8. The State suggests that this court remand the case to the trial court for correction of the clerical error. Because we have vacated the judgment for Count 6 and ordered that a single judgment be entered that reflects merger of Count 6 into Count 5, this issue is resolved.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed for Counts 1, 2, 10, 13, 23, 24, and 25. The judgment for Count 26 is vacated, and the charge is dismissed. The judgments for Counts 3, 4, 5, 6, 7, 8, 11, 12, 14, 15, 16, 17, 18, 19, 20, and 21 are vacated, and the trial court is ordered to enter judgments reflecting merger of convictions as explained in this opinion.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE